STEVE C. BUCKO v. J. F. QUEST FOUNDRY COMPANY.[1]

June 24, 1949.

No. 34,921.

[1]Reported in 38 N. W. (2d) 223.

*Dorsey, Colman, Barker, Scott & Barber, Henry Halladay,* and *Horace Hitch,* for relator.

*Thomas O. Kachelmacher,* for respondent Steve C. Bucko.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, and *George W. Olson,* for respondent Director of Division of Employment and Security.

*William D. Gunn* filed a brief as *amicus curiae* on behalf of Minnesota State Federation of Labor.

KNUTSON, JUSTICE.

Certiorari to review a decision of the director of the division of employment and security.

The material facts are not in dispute. Relator operates a foundry in the city of Minneapolis. Relator's employes are members of Local No. 176 of International Molders and Foundry Workers Union of North America, which, for brevity, will be referred to hereinafter as the union. For purposes of more effectively bargaining with the union, several Minneapolis employers operating foundries associated themselves together. They are members of and represented by an employers association called The Associated Industries of Minneapolis. This association has as its members numerous employers engaged in a great variety of industries. During the time material

to this case, relator and 11 other foundry operators whose employes were members of the union named above were members of this association. The association was a rather loosely formed organization. Any member could withdraw at any time, either during negotiations with the union or at any other time, simply by notifying the other members that it wished to withdraw. As long as they remained members, it appears that they were to be bound by a majority vote of the membership in the association. During 1947-1948, relator, together with eight other employers, had a contract with the union. Substantially similar contracts were signed individually by the other three members.

On January 29, 1948, the union served notice on the employers, through their bargaining agent, that it desired to negotiate changes in the contract then in force. On January 31, the employers, through their bargaining agent, likewise served notice on the union that they in turn desired to negotiate changes in the contract.

In conducting its affairs, the union had a strike committee on which the employes of each of the employers involved had representation, as well as those members of the union whose employers were in the same industry but who did not belong to the association. After some fruitless negotiations between the association and the union, a vote was taken by the union among all its members present at a meeting on March 4, which resulted in a general authorization being granted to the strike committee to call a strike at any of the foundry plants involved. Participating in this vote were employes of the 12 foundries which were members of the association and also other union members who were employes of foundries not belonging to the association. The strike committee likewise was not limited to union members whose employers belonged to the association. Subsequent to the vote so taken, the strike committee was in charge of calling strikes, and no separate vote was taken among the employes of an individual employer before a strike was called, although it appears that the union did ascertain the wishes of the employes of any employer before a strike was called at that particular plant.

Generally, however, the representative on the strike committee spoke for all the employes of the plant at which he worked.

On March 4, 1948, the union caused a notice of intention to strike to be filed with the state labor conciliator, in which 10 of the 12 employers belonging to the association were named, and contemporaneously therewith it filed an identical notice covering the other two of the 12 employers of the association. Thereafter, negotiations continued between the union and the employers with the assistance of the state labor conciliator. Some progress was made toward a settlement. On April 10, a joint offer made on behalf of the 12 employers was submitted. This proposal was rejected by the union membership. Negotiations continued with the aid of the federal conciliator. The union was then advised that the employers would consider a strike against any of the 12 as a strike against all.

On April 13, the 12 employers, through their association, prepared and thereafter filed with the labor conciliator a notice of intention to lock out, which so far as material here reads:

"As the representative of the foundry employers listed below, I am herewith at their instruction, filing with you a notice under the Minnesota Labor Relations Act of their intention to institute a lockout in connection with a current labor dispute.

\* \* \* \* \*

"This lockout notice is only for the purpose of protecting this employer group against an attempt on the part of the Union to strike less than all of the 12 companies negotiating as a unit with the Union. It will be used only if the Union strikes less than all 12 companies in the event any strike should take place as a result of the existing dispute."

The position taken by the employers with respect to their intention to lock out all shops if a strike was called against less than all of them was known generally to all employes and the union prior to the calling of any strike.

On April 14, the strike committee called a strike against two of the 12 employers, and on April 16 a strike was called against the third of such employers.

On April 22, the employes of the remaining nine employers were notified that there would be no further work until the dispute was settled, and on April 26 these nine foundries shut down and posted notices on their doors that there would be no further work.

Prior to calling any strike, the union had procured "strike sanction" from the international union, thereby qualifying for strike benefits those employes who were out of work on account of the dispute. It also obtained approval from the Minneapolis Central Labor Union. During the strike, all employes who did not procure work elsewhere received from $10 to $15 per week benefits from the union, and those who procured work elsewhere were assessed $5 per week, which the union disbursed to those who were unemployed. Such benefits were paid to the employes of the three plants involved directly in the strike and also to the employes of the nine other plants that had shut down.

After the commencement of the strike, pickets were posted at the places of ingress to and egress from the foundry against which the strike was called, showing that a strike was in process, and pickets were also posted around the plants that were shut down stating that a lockout was in process.

The employes of the nine plants against which no strike had been called were willing to continue working at the time the doors of these plants were closed.

On May 28, a proposal was made by the employers for a resumption of work pending continued negotiations for a permanent settlement, under which proposal concessions were made granting increases in pay over the old contract. This proposal was confirmed in writing the following day. Among other provisions, it contains these paragraphs:

"All issues unsettled at the time the strike started on April 14th which are still unsettled including the question of wages shall be

subject to *continued negotiations* between the parties following the resumption of operations.

"Both parties shall have the right to re-institute the strike or lock-out upon ten (10) days notice to the State Division of Conciliation." (Italics supplied.)

The proposal was rejected by the union membership.

Subsequent to the shutdown, some 60 employes of the nine employers against whom no strike had been called by the union filed claims for unemployment compensation benefits. No claim was made by the employes of the three plants against which a strike had been called. Because of the large number of claims involved, the matter was referred directly to the appeal tribunal without an individual administrative determination of validity. The appeal tribunal found and determined that the claimants were eligible for unemployment compensation. On appeal to the director, the decision was affirmed. By stipulation of the parties, it was agreed that the question of the validity of all claims involved the same determination of applicable law and that an appeal should be taken in one case only, the decision in that case to govern all so far as the legal phases of the claim were concerned. The decision comes here for review upon certiorari.

■ The scope of our review is governed by the rules laid down in State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759, followed in Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. (2d) 506. In the Dybdal case, we stated the rule to be (145 Minn. 225, 176 N. W. 761):

"* * * The review which the court can make of a finding of the commission is limited. It cannot disturb the commission's determination because it does not agree with it. It can only interfere when it appears that the commission has not kept within its jurisdiction, or has proceeded upon an erroneous theory of the law, or unless its action is arbitrary and oppressive and unreasonable so that it represents its will and not its judgment, or is without evidence to support it. This principle of review is applied when it is

sought to review by mandamus or on statutory appeal the exercise of the various functions committed by the legislature to different boards and commissions."

■ Our Minnesota unemployment compensation law first came into being by virtue of Ex. Sess. L. 1936, c. 2. It was passed at a time of economic distress. The purpose of the act is evident from the legislative declaration of public policy contained in § 1 (M. S. A. 268.03), which reads:

"As a guide to the interpretation and application of this Act, the public policy of this State, is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this State will be promoted by providing, under the police powers of the State for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

The act is similar in purpose and operation to acts passed by practically all states at about the same time in order to coöperate with and take advantage of the federal social security act. In the original act, certain disqualifications were provided, among which are those contained in § 7, which reads in part as follows:

"An individual shall be disqualified for benefits—

\* \* \* \* \*

"(d) For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work

138

which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: Provided that this subsection shall not apply if it is shown to the satisfaction of the commission that—

"(1) He is not participating in or financing the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing the dispute; and provided further, that if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purposes of this subsection be deemed to be a separate factory, establishment, or other premises."

Disqualification due to a labor dispute remained substantially the same as originally passed until the enactment of L. 1943, c. 650, where the act was amended. Section 5 reads in part as follows:

"An individual shall be disqualified for benefits: * * *

* * * * *

"F. If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed, except that this disqualification shall not act to deny any individual the right to benefits based on employment subsequent to his separation because of a strike or other labor dispute if such an individual has in writing notified the employer involved in such strike or other labor dispute of his resignation and acceptance of his resignation and acceptance of other bona fide employment and provided further that such resignation is accepted by all parties to the strike or other labor dispute so that such individual is no longer considered an employee of such employer. For the purpose of this section the term 'labor

dispute' shall have the same definition as provided in the Minnesota Labor Relations Act. Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

It has so remained since that time and is now M. S. A. 268.09, subd. 1(6).

The unemployment compensation statutes of all 48 states, as well as those of Alaska, Hawaii, and the District of Columbia, contain provisions disqualifying claimants whose unemployment is the result of a labor dispute.[2]

The statutes of a few states recognize unemployment due to a lockout as an exception to the disqualification.[3] Connecticut recognizes the exception if the lockout results from an effort on the part of an employer to deprive the employes of some advantage they al-

---

[2] For a collection of such statutes, see 49 Col. L. Rev. 550. For a discussion of the statutes of the various states, see Schindler, *Collective Bargaining and Unemployment Insurance Legislation*, 38 Col. L. Rev. 858; *Unemployment Compensation in Labor Disputes*, 49 Yale L. J. 461.

[3] In Ohio it is at least recognized. Page's Ohio Gen. Code Ann. 1948 Supp. § 1345-6(d)(1), provides that benefits shall not be paid where the individual "lost his employment or has left his employment by reason of a labor dispute (other than a lockout) at the factory, establishment, or other premises at which he was employed, as long as such labor dispute continues."

Kentucky Rev. St. 1948, § 341.360(1), contains the following exception relating to a strike or other bona fide dispute: "* * * For the purpose of this paragraph a lock-out shall not be deemed to be a strike or bona fide labor dispute and no worker shall be denied credit for a waiting period or be denied benefits by reason of a lock-out."

Arkansas St. 1947 Ann. § 81-1106(d)(2), provides: "For the purpose of this section a lockout shall not be deemed to be a labor dispute and no worker shall be denied benefits or credit for a waiting period by reason of a stoppage of work caused by a lockout."

West Virginia 1947 Supp. to Code of 1943 Ann. § 2366(78)(4), provides that no disqualification due to a labor dispute shall be imposed "if an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions."

ready have, but not if it results from demands of the employes.[4] Mississippi recognizes the exception within certain limitations.[5] The New York statute expressly includes lockouts in the section which provides for suspension of accumulation of benefit rights. See, 30 McKinney's Cons. Laws New York Ann. § 592.

We recognized a lockout as a labor dispute even in the original act. Ex. Sess. L. 1936, c. 2, § 7(2) (a), provides that benefits shall not be denied for refusal to accept work "if the position offered is vacant due directly to a strike, lockout, or other labor dispute." This provision remains in the present law, M. S. A. 268.09, subd. 1(5) (b) (1), exactly as it was originally enacted and follows the federal act. 42 USCA, § 1103(a) (5). Prior to the 1943 amendment, a lockout was held to be a labor dispute within the meaning of the act so as to disqualify employes affected. Decision Minn. App. Trib. No. 56 (March 2, 1939) cited in 49 Yale L. J. 479.

Many states have considered cases involving the application of statutes disqualifying employes for unemployment due to labor disputes of one kind or another, but so far as we have been able to find no court has considered an exception based on a lockout such as we

[4]Connecticut Gen. St. Rev. 1949, § 7508(3), disqualifies for unemployment due to a labor dispute and then contains the following exception: "provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess;"

[5]Gen. Laws Mississippi 1944, c. 288, § 1, provides that an individual shall not be disqualified in case of a labor dispute if—

"(1) He is unemployed due to a stoppage of work occasioned by an unjustified lockout; provided, however, such lockout was not occasioned or brought about by such individual acting alone or with other workers in concert; or

"(2) He is not participating in or directly interested in the labor dispute which caused the stoppage of work; and

"(3) He does not belong to a grade or class of workers of which, immediately before the commencement of stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in the dispute:"

have in our statute under facts similar to those we have before us. The cases are collected in Annotations, 135 A. L. R. 922; 148 A. L. R. 1310; 154 A. L. R. 673; 173 A. L. R. 490. No useful purpose would be served by attempting a comparison of these cases or attempting to distinguish them. Many of them involve statutes quite similar to our original statute, but it is evident that our legislature intended to eliminate the disqualification based on a labor dispute where unemployment is due to a lockout, so cases decided under statutes lacking such exception are of no help in determining the question now before us.

It is interesting to note that when our legislature proposed the 1943 amendment the exception pertaining to lockouts was not in the original draft of the bill, but came in by way of an amendment to the bill near the end of the legislative session. See, H. F. 1332, 1943 legislative session. As the bill was originally drafted, employes would have been disqualified in any case where unemployment was due to a strike or other labor dispute. It is reasonable to assume that the legislature adopted the exception advisedly and with full knowledge of the generally accepted meaning of the term "lockout." The 1943 amendment (c. 650, § 5[F]) specifically adopts the definition of "labor dispute" contained in our labor relations act, § 179.01, subd. 7.[6] This definition of a labor dispute obviously includes both a strike and a lockout, as well as any other type of labor dispute. The definition of a lockout in our labor relations act, § 179.01, subd. 9,[7] was not specifically adopted in our unemployment compensation law, but whether that definition or any other is adopted the net result is the same. In Webster's New Int'l Dictionary (2 ed.) 1934, "lock out" is defined thus: "To withhold employment from

---

[6] 'Labor dispute' includes any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants."

[7] 'Lockout' is the refusal of the employer to furnish work to employees as a result of a labor dispute."

(a body of employees) as a means of bringing them to accept the employers' terms." See, Magner v. Kinney, 141 Neb. 122, 127, 2 N. W. (2d) 689, 692.

In Iron Molders' Union v. Allis-Chalmers Co. (7 Cir.) 166 F. 45, 52, 20 L.R.A. (N.S.) 315, we find this definition: "A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms." For other definitions, see 25 Wd. & Phr. (Perm. ed.) p. 566.

It has been held that when an employer discharges his employes, who are about to enter upon a strike, before they can strike it constitutes a lockout. A. T. & S. F. Ry. Co. v. Gee (C. C.) 140 F. 153. A lockout is included in the term "labor dispute" within the meaning of unemployment compensation statutes. In re North River Logging Co. 15 Wash. (2d) 204, 130 P. (2d) 64.

Relator contends that the term "lockout" as used in the 1943 amendment must be construed in the light of the general-purpose clause of our unemployment compensation law and that employes are not eligible for benefits where the unemployment is due to their participation in a labor dispute bringing it about.

The legislative declaration of public policy is to be used as a guide to the interpretation and application of the act. It is the declared public policy of our state that benefits are intended to extend only to those persons who are unemployed through no fault of their own. Ex. Sess. L. 1936, c. 2, § 1. In applying this policy to the amendment now under consideration, we must consider the legislative purpose and interpretation of the words used in the amendment. The original act extended the disqualification to all unemployment (Ex. Sess. L. 1936, c. 2, § 7[d]) "due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." An exception was made of an employe who (§ 7[d][1]) "is not participating in or financing the labor dispute which caused the stoppage." Fault was predicated largely upon participation. In the 1943 amendment, disqualification was extended to all unemployment due to a (c. 650, § 5[F]) "strike or other labor dispute."

Participation was eliminated as an element in determining fault. Instead, an exception was made in the event of a lockout or dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike. The legislature must have concluded that unemployment due to a lockout is in no way the fault of the employe; hence, the exception included in the statute.

Had the legislature seen fit to do so, it could have limited the exception pertaining to lockouts to those not caused by demands of the employes, as was done in the Connecticut statute, or could have further limited the lockout as one not caused by a labor dispute in which the employe was participating, as was done in the Mississippi statute. Not having limited the term "lockout" in any sense, we must conclude that the legislature was of the opinion that the unemployment due to a lockout, regardless of how or why it was instituted, was not due to any fault of the employe. We must construe the word "fault," as a basic element in our legislative policy, in connection with the term "lockout" as used in the amendment, and, if we do, the *fault* which governs is the ultimate and final act causing the unemployment rather than any preliminary act which might furnish a motive for a lockout causing the unemployment. By so doing, we give meaning to the present statutory provision excepting from the disqualification unemployment due to a lockout without doing violence to the legislative declaration of public policy limiting the right to benefits of unemployment due to no fault of the employe.

■ Relator contends that before a lockout may operate to qualify employes for benefits who are otherwise disqualified on account of a labor dispute the lockout must be instituted during the period of negotiation in a labor dispute and prior to the commencement of a strike. In other words, relator claims that the words in the last sentence of M. S. A. 268.09, subd. 1(6), "during the period of negotiation in any labor dispute and prior to the commencement of a strike," relate to and modify the word "lockout" as well as the word "dismissal." Relator contends that negotiations had broken off completely prior to the institution of the lockout and also that a

strike had then been commenced; hence, they argue, a lockout did not operate to take the employes outside the general disqualification of the statute.

The word "lockout" is separated from the rest of the sentence by the disjunctive word "or." Insofar as its effect upon the employes is concerned, it would make no difference whether a lockout occurred during negotiations or after negotiations ceased, nor would it make any difference whether it was instituted before or after a strike was called, if a strike and a lockout can exist simultaneously within the same unit of employment at all. When a lockout is instituted, the employe does not sever his relationship with his employer, but the employe is out of work due to an act of the employer over which he has no control. The word "dismissal," on the other hand, might relate to many things, and it is necessary to qualify it in order to have any meaning at all as used in this statutory provision. It is obvious that the legislature did not intend that an employe who was dismissed for cause after negotiations for settlement of a labor dispute had ceased, or was dismissed after a strike had been started, should be eligible for benefits. A dismissal implies a complete severance of the relationship between employer and employe. The legislature must have had in mind that it was necessary to limit the time within which a dismissal should give rise to eligibility. The dismissal must be so limited that it has causal connection with the labor dispute. The lockout, by its very nature, has such connection without qualification. We hold, therefore, that the term "lockout" is not modified by the remainder of the sentence, but that it stands by itself.

In any event, the appeal tribunal found that the lockout occurred during negotiations. This finding is amply supported by the evidence, so we are bound by it regardless of what construction is placed upon the term "lockout."

Relator further contends that there was no lockout within the purview of our act, but that respondent and the others similarly situated were unemployed because of a strike. In other words, it

argues that all 12 employers were bargaining as a unit and that a strike against one was a strike against all.

This contention is untenable for several reasons. In the first place, the disqualification due to unemployment resulting from a strike or other labor dispute, as set forth in § 268.09, subd. 1(6), relates to such strike or labor dispute "in progress at the establishment in which he is or was employed." It can hardly be said that respondent and the others similarly situated were out of work due to a strike against the three establishments in which they were not employed. It is no doubt true that had it not been for the exception pertaining to a lockout it could be said that a labor dispute existed at the other nine places as well, but in view of the fact that there was no strike called against the nine employers here involved, and a lockout is excepted from the disqualifying labor dispute, the term "strike" cannot be extended to encompass those nine employers whose employes were willing to continue working under the terms of the former contract.

In the second place, the employers themselves have recognized the fact that the employes of the nine establishments were unemployed as a result of a lockout. They served their notice of intention to lock out required by our state labor relations act. Again, in their proposal for settlement submitted on May 29, 1948, they stated in writing that "Both parties shall have the right to *re-institute the* strike or *lock-out* upon ten (10) days notice to the State Division of Conciliation." (Italics supplied.)

In their claim of disqualification in some of the cases, the employers stated that the reasons the employe was disqualified was due to the fact that he was "locked out because of a labor dispute."

In Bunny's Waffle Shop, Inc. v. California Emp. Comm. 24 Cal. (2d) 735, 151 P. (2d) 224, the facts are somewhat similar to those now before us, but the law in California has no exception such as ours. In that case, a group of restaurant employers joined together in a council for the purpose of bargaining collectively with the union representing the employes of the group. The union refused to bargain with the group, whereupon the employers informed the

union that subsequent to a stated date wages would be reduced until the union agreed to bargain with the council. Pursuant to this plan, wages were reduced and some of the employes quit. Thereupon, the employers all closed their restaurants, and the employes filed claims for unemployment compensation. In upholding the award of compensation and holding that the unemployment was not due to a labor dispute, the California court said (24 Cal. [2d] 740, 741, 151 P. [2d] 226, 227):

"* * * The act does not disqualify an employee from receiving benefits in all cases where his unemployment results directly or indirectly from a labor dispute, but makes him ineligible only if he left his work because of the dispute. * * *

* * * * *

"* * * A strike sanction, however, merely indicates approval by a central union agency of a possible strike and is primarily a threat of economic action. *A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute.* If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute. The threat of possible economic action involved in a strike upon one of a group of employers or in obtaining strike sanction bears no analogy to the employers' act in the present case, for the latter culminated in actual economic action against the employees that caused them to leave their work." (Italics supplied.)

It is our belief that under our statute, once it is established that the unemployment is due to a lockout, the exception to the disqualification applies regardless of whether the employe participates in the labor dispute or not.

Relator relies strongly on the two cases of Barnes v. Hall, 285 Ky. 160, 146 S. W. (2d) 929, and Miners v. Hix, 123 W. Va. 637,

17 S. E. (2d) 810. Both cases are clearly distinguishable from the case now before us.

The Barnes case was decided under the Kentucky law, which for all practical purposes is similar to ours. Section 4748g-9(b) of the unemployment compensation act of 1938, which is now § 341.360 of Kentucky Rev. St. 1948, provides that an employe is disqualified for benefits (see 285 Ky. 161, 146 S. W. [2d] 929):

"If he has left (or partially or totally lost) his employment with an employer because of a strike or other bona fide labor dispute, for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed, *provided that for the purposes of this subsection a lock-out shall not be deemed a strike or a bona fide labor dispute and no worker shall be denied benefits by reason of a lock-out.*" (Italics supplied.)

An employe of a mining company was denied benefits by virtue of this provision. Briefly, the facts were that the employes were seeking to procure a more favorable contract than the one they had. At the expiration of their contract, the operators offered to renew the existing contract for a period of two years. This offer was rejected. The miners refused to work without a contract, and the mines were closed down. Claiming that they were out of work due to a lockout and therefore within the exception of the disqualification, the employes filed claims for unemployment compensation. The Kentucky court held that they were not unemployed on account of a lockout and affirmed the decision of the commission. The court said (285 Ky. 176, 177, 146 S. W. [2d] 936):

"* * * the miners lost their employment, and, in the absence of an intervening 'lock-out,' remained unemployed until the new contract was executed in May 1939, because of a bona fide labor dispute.

* * * * *

"* * * Prior to the expiration of the old contract, the operators had abandoned any attempt to secure a reduction in wages and had offered to renew the existing contract for a period of two years. Hence, so far as the record shows, there is nothing to support an

assumption that the appellants desired to cease operations in order to obtain more desirable terms from their employees. Abandoning theories and examining the proven facts, we find no evidence indicating that any one of the appellants either desired to close its mines, or actually did so. On the contrary, the evidence clearly indicates that the only reason they did not continue to operate was the refusal of the union miners to work until an agreement had been reached by the negotiators representing the union and the operators. There is no evidence whatsoever that any miner who offered or was willing to work was refused employment by any one of the appellants."

In the case before us the exact opposite is true. Here, the employes of the nine establishments involved were willing to continue working under the old contract. Relator seeks to convert the lockout into a strike. It argues that the labor dispute produced the strike; that the lockout was not the result of the labor dispute, but, instead, the result of the strike. That being true, it argues, there was no lockout within the meaning of the term as used in the employment and security law, assuming that the term has the same meaning as that contained in the Minnesota labor relations act.

The weakness of this argument is that relator assumes that the association of 12 employers was a bargaining unit and that the strike against three forced the employers in the other nine establishments to discontinue operation. There is no evidence that would sustain such a finding. The fact that a strike was called against three did not compel the other nine to close their shops. They did so in order to make use of an economic weapon which they held in their hands and for the sole purpose of forcing the union to accept terms less favorable than those which the union demanded. The evidence is conclusive that at the time the nine establishments closed their doors the employes of those nine were willing to continue to work at the existing rates of pay and according to the terms of the preëxisting contract. As such, it cannot be said that the unemployment was due to the strike. To be sure, there was a labor dispute

existing in all 12 establishments, but the legislature has seen fit to remove from the disqualification unemployment due to a lockout, and it cannot be said that unemployment in the nine establishments was due to anything but the lockout.

Miners v. Hix, 123 W. Va. 637, 17 S. E. (2d) 810, *supra,* was decided under West Virginia Acts of the Legislature, Second Extraordinary Session, 1936, c. 1, art. 6, § 4(4), which so far as material here provided that employes should be disqualified for benefits—

"(4) For a week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed, unless the director is satisfied that he was not (one) participating, financing, or interested in such dispute, and (two) did not belong to a grade or class of workers who were participating, financing, or directly interested in a labor dispute which resulted in a stoppage of work."

This section is almost identical with our original act, Ex. Sess. L. 1936, c. 2, § 7(2)(d).

The West Virginia act was amended by the 1941 regular session of the legislature by adding the following (see 123 W. Va. 655, 656, 17 S. E. [2d] 819):

"* * * No disqualification under this subsection shall be imposed if the employees are required to accept wages, hours or conditions of employment less favorable than those prevailing for similar work in the locality, or if employees are denied the right of collective bargaining under generally prevailing conditions, *or if an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions.*" (Italics supplied.)

The court recognized this change in the statute and held that the decision must be based upon the statute as it existed at the time the claim arose, at which time there was no exception due to a lockout or a shutdown by the employer.

■ Relator also claims that respondent and the others similarly situated were engaged in self-employment or were performing services for the union subsequent to the time they became unemployed. The question whether or not they remained unemployed so as to be eligible for benefits is not for our determination. The director must administratively determine from time to time whether any person who becomes unemployed and is entitled to benefits under the act remains eligible. If he procures other employment, he may become ineligible even though he was originally eligible. That is a matter requiring administrative determination from time to time.

Relator also contends that respondent was subject to discharge for misconduct. It does not point out what misconduct existed which would justify a discharge. Of course, there may have been individual cases where such discharge would be justifiable, but there is no evidence in the case that would warrant a holding that, as applied to the employes of all nine employers here under consideration, they were all subject to discharge for misconduct. This contention merits no discussion.

Relator next contends that, even though we assume that the original unemployment of respondent and his fellow claimants was of such a nature that it did not disqualify them, the unemployment became of a disqualifying nature after the rejection on June 1, 1948, of the employment offer. In other words, relator claims that after the rejection of such offer the unemployment became due to a strike even though it originated in a lockout.

The fallacy of this argument is that the employers did not offer to permit the employes of the nine establishments to go back to work, nor did the offer relate to those nine. The offer required acceptance by all 12 establishments, and it would have required an end of the strike which had been called against the three. There is no evidence in the record, nor does relator now contend, that at any time it offered to permit the employes of the nine establishments against whom no strike had been called to go back to work, even at the same pay and upon the same terms as they had been working at the time the doors were locked. It cannot be said that this act of the

employers in seeking to force an end to the strike could change the nature of the unemployment at that time. Had the employers offered to take back all employes at the nine establishments, even upon the same terms as they had been working when the lockout occurred, a different situation would have existed, but we have no showing of that kind here.

It is claimed that as construed by the director the provision of our statute allowing benefits to persons unemployed due to a lockout places in the hands of the employes an unfair economic weapon. If so, it presents no question for judicial determination. The opposite might be said of the disqualification placed upon employes due to a strike. In the one case, an employer must determine the advantage of a lockout, knowing that his employes will be eligible for unemployment benefits if they are locked out, and in the other case the employes or the union representing them must determine whether or not to call a strike, knowing that the employes will thereupon be disqualified. If it does provide an unfair economic weapon resulting in an injustice to employers, the question is one that "can only properly be debated in the legislature." Rhea Mfg. Co. v. Industrial Comm. 231 Wis. 643, 651, 285 N. W. 749, 753. "Viewed in its social and economic aspects, the lockout is a weapon in the hands of the employers which is a counterpart to the weapon of strike held by the workers." In re North River Logging Co. 15 Wash. (2d) 204, 208, 130 P. (2d) 64, 66. Like the use of any other weapon, the consequences to the one against whom it is directed, as well as to the one who directs its use, must be weighed before it is used, and if its use results in more harm to the holder of the weapon than to the one against whom it is directed he who has control of its use should not be heard to complain that it has resulted in harm to himself.

The decision of the director is amply supported by the evidence and according to law, and it is therefore affirmed.

Affirmed.