## Hogan Unemployment Compensation Case.

Argued March 27, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*M. H. Goldstein,* for appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, and *R. Carlyle Fee,* Associate Counsel, for appellee.

*John E. Laughlin, Jr.,* with him *Clyde Slease, Joseph E. Madva,* and *Thorp, Bostwick, Reed & Armstrong,* for employer, intervenor, appellee.

OPINION BY RENO, J., September 26, 1951:

So far as is here pertinent, §402(d) of the Unemployment Compensation Law, as amended by the Act of May 23, 1949, P. L. 1738, §11, 43 P.S. §802, provides: "An employe shall be ineligible for compensation for any week—(d) In which his unemployment is due to a stoppage of work, which exists *because* of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . ." (Emphasis added.)

There was a labor dispute between the Dravo Corporation and the Industrial Union of Marine and Shipbuilding Workers of America, Local No. 61, a C. I. O. affiliate. On July 18, 1949, a stoppage of work occurred at the Neville Island Shipyard, Engineering Works Division. The Board held that the stoppage resulted from a strike, not a lock-out, and denied benefits. Claimant Hogan, for himself and as the representa-

tive of his fellow-employes, appealed. Dravo appeared as an intervening appellee.

The findings of fact, briefly stated, present this picture.[1] Dravo and the Union had a collective bargaining agreement which was to expire on July 16, 1949, at 12:24 a.m. By its letter of May 11, 1949, the Union notified Dravo that it desired a modification of its terms, and between May 31 and July 15 approximately 10 negotiation meetings were held. A federal labor conciliator appeared on July 12, and requested Dravo to extend the existing contract for 5 days to permit him to familiarize himself with the issues involved. Dravo refused on the ground that negotiations were still in progress. A similar request was made on July 13th and 14th by representatives of the Union, and again refused on the same ground. None of these requests were made at scheduled negotiation meetings. On July 13th at a regular negotiation meeting Dravo made a verbal proposal to the Union, which was subsequently reduced to writing, submitted to a meeting of the Union, and rejected by it. The Union informed Dravo that it "had to make more concessions. The company replied that no more would be made."

Dravo had arranged a picnic for its 5000 employes on July 16th. The Union agreed to "supply the necessary men to handle arrangements for the picnic and would not interfere therewith." But on the day before the picnic, July 15th, a representative of the Union announced to employes as they left their work, over a loud speaker attached to an automobile, that there would be no work after 12:24 a.m. July 16th. This announcement was made pursuant to the "no contract, no work" principle adopted by the Union, which had

_____

[1] Our statement of the facts is an accurate paraphrase of the Board's findings. The matters in quotation marks are verbatim reproductions of portions of the findings.

voted to "stop work upon expiration of the existing contract unless the existing contract were extended or a new contract agreed upon."

Because of the picnic no work was scheduled for that day and the following day, Sunday, was not a normal working day. At midnight of Sunday the Union posted pickets, and on Monday, July 18th, work stopped. On that morning Dravo's plant was "open with the necessary supervisory personnel present and work would have been furnished the union members on the basis of the same terms and conditions as existed under the prior contract had they reported for work."

Two findings are here quoted verbatim: "12. Following the expiration of the contract at 12:24 a.m. on July 16, 1949, the employer company was willing and prepared to continue the furnishing of employment to the members of the union under the same terms and conditions of employment as existed under the expiring contract. Its refusal to extend the existing contract was not based upon any unwillingness or inability to continue the furnishing of employment after the expiration of the contract, but upon an unwillingness to agree to an extension of the contract while time for negotiation, with the possibility of agreement, still remained."[2]

---

[2] Concerning this feature of the case the Board said: "The employer was unwilling to agree in advance to an extension of the contract while time for negotiation, with the possibility of agreement, still remained. True, the remaining time was short, *but we have discovered in many cases* that the approach of the expiration date gives impetus to the completion of negotiations and that many contracts are agreed upon shortly before the expiration of the existing contract. Thus, the employer's failure to agree to an extension while time for negotiations still remained warrants no inference as to its attitude relative to continuing operations upon expiration of the contract." (Emphasis added.) When

"13. The unemployment of the claimant (and others similarly situated) during the period in question was not due to any unwillingness or inability on the part of the employer company to continue the furnishing of employment on the basis of the same terms and conditions as existed under the expiring contract, but to his unwillingness and/or failure to report for employment which continued to exist on the basis of the same terms and conditions as those under which he had been working."

Appellant argues that several findings are not supported by the evidence. There were conflicts in the testimony, and it was the duty of the Board to resolve them, to determine the credibility of witnesses, the weight of the testimony, and to draw reasonable inferences from it. Appellate review is performed by considering the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. *Stillman Unemployment Compensation Case,* 161 Pa. Superior Ct. 569, 56 A. 2d 380. Moreover, where the Board's decision is against the party upon whom rests the burden of proof the question on appellate review is whether the Board's findings of fact are consistent with each other and with its conclusions of law and its order, and can be sustained without capricious disregard of competent evidence; unless the answer is in the negative, the order must be affirmed. *Lavely Unemployment Compensation Case,* 163 Pa. Superior Ct. 66, 60 A. 2d 352. A demonstration that the findings are supported by competent and substantial evidence would extend this opinion to inordinate lengths. It is suffi-

---

an administrative board rests its conclusion upon *its own official experience* the courts generally respect its special competence. See, e.g., *Skidmore v. Swift & Co.,* 323 U. S. 134, 140, 65 S. Ct. 161, 164.

cient to state that a thorough examination of the testimony has produced the firm conviction that the findings are amply supported by evidence of the required quality. Consequently they are binding upon this Court. Law, supra, §510, 43 P.S. §830.

"Because" in the applicable section, supra, commands the Board to ascertain the direct, immediate, final and effective *cause* of, the potent and activating reason for, the work stoppage. See *Carnegie-Illinois Steel Corp. v. Review Board of Indiana Employment Security Division*, 117 Ind. App. 379, 72 N. E. 2d 662; cf. *Bucko v. J. F. Quest Foundry Co.*, 229 Minn. 131, 38 N. W. 2d 223. If it finds that the stoppage was caused by a labor dispute other than a lock-out it is required to deny benefits. A lock-out has usually been contrasted with a strike, as in §4(t) of the Law, 43 P.S. §753, and the amendment of 1949 might have drawn the distinction more clearly. Still, the legislature plainly manifested its intention that where work was stopped by a labor dispute, including a strike, benefits shall be denied. That there was a labor dispute at the Dravo plant cannot be doubted.

Strikes and lock-outs are economic weapons. "A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is attained, that is, until the employer grants the concession demanded :" Restatement, Torts, §797, Comment *a*. "A lockout is an employer's *withholding of work* from his employees in order to gain a concession from them. It is the employer's counterpart of a strike . . .": Id., §787, Comment *a*. (Emphasis added.) A lock-out may be present in varying factual situations, and no definition can comprehend all its manifestations. The core of a lock-out is the act of an employer in *withholding work*, which includes the physical closing of the place of employment, as in *Burger Unemployment Compensation Case*, 168 Pa. Superior Ct. 89,

77 A. 2d 737, but is not limited to the existence of that condition. An employer may impose a lock-out without physically closing his plant or without forbidding access to it by his employes. *Barnes v. Hall,* 285 Ky. 160, 146 S. W. 2d 929. But proof of a lock-out is not made out by evidence that the employer, as here charged by appellant, offered terms of employment which his employes allege were less advantageous than those contained in a prior contract. See *Miners v. Hix,* 123 W. Va. 637, 17 S. E. 2d 810.

The processes of collective bargaining must be left free and untrammeled for both employers and employes, allowing both sides opportunity to secure favorable or even advantageous terms of employment. The law contemplates only that collective bargaining be conducted in good faith, with a sincere purpose to find a basis for agreement. But the parties bargain at arm's length; either side may propose and reject terms; and request new or counter proposals. 56 C. J. S., Master and Servant, §28(23). And the incidents common to all types of bargaining must be expected and indulged; e.g., wordy chaffering, haggling over details, maneuvering for position, feigned ultimatums, offers of compromise settlements, and the like.

It is not within the province of the Board to consider or determine whether one party proposed terms less or more advantageous than those agreed to in a prior or an existing contract. Changes in economic conditions may warrant, indeed compel, modifications of existing terms. For the Board to attempt to settle the reasonableness of offers or demands would involve a consideration of economic problems beyond the scope of the authority vested in it and decisions of questions only remotely, if at all, related to the administration of the Unemployment Compensation Law. There is no standard of wages and terms of employment, and the Board does not have a yardstick with which to meas-

ure their reasonableness. It cannot write an ex post facto contract for the parties or pass judgment upon the deliberations of negotiators or upon occurrences in the negotiation of a collective bargaining agreement.

Whether or not an employer fulfilled his obligation to bargain collectively is not a question for the Board of Review. That question is remitted initially to the State Labor Relations Board, and the courts ordinarily reach that question only upon an appeal from the decision of that board. Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, 43 P.S. §211.1, et seq. That is to say, if an employer breaches the legal duty to bargain collectively, laid upon him by the Act, supra, §6(1)(e), the State's Unemployment Compensation Fund, which consists of *his* and the contributions of *other* employers, is not liable for his dereliction. *Glen Alden Coal Co. v. Unemployment Compensation Board of Review,* 168 Pa. Superior Ct. 534, 79 A. 2d 796. The negotiations are relevant to show the history of the negotiations and the attitude of the parties, but the ultimate and crucial question is: *What* occurred *after* negotiations ceased, or failed to produce an agreement, and *what* and *who caused* the work stoppage?[3]

The Board found that the Dravo plant remained open after the negotiations ceased and that it was willing to furnish work to claimant and his co-workers upon the same terms and conditions in force under the expired contract. True, Dravo submitted its terms as a "rock bottom" proposition, but it did not insist upon their acceptance as a condition to continued employment, and it did not withhold work from the union members. Appellant complains that Dravo did not

---

[3] Stated in other terms, the question poses a similar, but not exactly the same, problem which we have met in other contexts: Did the work stoppage result from the decision of the employes or some action of their employer? *Stillman Unemployment Compensation Case,* supra.

communicate to the Union its willingness to operate under the terms of the expired agreement. But the evidence of its willingness was manifest; the plant was open and operating; work was being performed by other workers;[4] and access to it was not forbidden, except by the Union's pickets. Had there been any doubt about Dravo's position, a simple inquiry would have dispelled it. There was no withholding of work by Dravo, and consequently no lock-out.

On the other hand, the Union had proclaimed: "no contract, no work", and the claimant and his fellow members, for that reason, did not report for work. In the absence of a contract the union members were justified in refusing to work, but the refusal was nonetheless a strike. Our Pennsylvania legislation and decisions have not dealt with that question, but the Taft-Hartley Act specifically provides: "The term 'strike' includes any strike or other concerted stoppage of work by employees *(including a stoppage by reason of the expiration of a collective-bargaining agreement)* and any concerted slow-down or other concerted interruption of operations by employees": Act of June 23, 1947, Title V, §501, 61 Stat. 161, 29 U. S. C. A., §142. (Emphasis added.) We are not bound by Congressional legislation, but the principle is sound and applicable, and therefore we adopt it, and hold that a concerted cessation of work after the expiration of a collective bargaining agreement, in the absence of other and qualifying circumstances, is a strike. Certainly it is a strike where the Union expressly avows and acts upon the principle of "no contract, no work." The Board properly concluded that the *final cause* of the work stoppage was

---

[4] The record in *Urbach Unemployment Compensation Case*, 169 Pa. Superior Ct. 569, 83 A. 2d 392, indicates that Dravo continued its operations and that other employes remained at work until the Union extended its picket line and thereby barred their access to the plant.

the refusal of the union members to work without a contract. The resultant cessation of work constituted a strike and disqualified the employes for benefits.

The cause for the stoppage having been ascertained, it follows that claimant and his fellow members, who caused the stoppage, became unemployed through their own fault, within the meaning of the Law, §3, 43 P.S. §752, which is the lode star by which all provisions of the Law are construed. *Michalsky Unemployment Compensation Case,* 163 Pa. Superior Ct. 436, 62 A. 2d 113. Under that section and §402(d) supra, benefits were properly denied.

Decision affirmed.