Dimitroff Unemployment Compensation Case.

Argued November 12, 1958.  Before RHODES, P. J., HIRT, GUNTHER, ERVIN, and WATKINS, JJ.  (WRIGHT and WOODSIDE, JJ., absent).

*Sheldon Tabb,* with him *Edward Davis,* for claimant, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board, appellee.

*Lewis H. VanDusen, Jr.,* with him *Hayward H. Coburn,* and *Drinker, Biddle & Reath,* for employer, intervening appellee.

OPINION BY RHODES, P. J., March 18, 1959:

Claimant, Mary Dimitroff, appealed from the decision of the Unemployment Compensation Board of Review. The board had denied her claim for benefits on the ground that her unemployment was due to a stoppage of work which existed because of a labor dispute[1] other than a lockout within the meaning of section 402 (d) of the Unemployment Compensation Law, 43 PS §802 (d). The determination of this case will also affect the claims of other employes involved in the work stoppage which occurred on June 17, 1957, at the Philadelphia bakery of the National Biscuit Company.

The board denied compensation after making extensive and detailed findings of fact. Both the referee and the bureau had denied benefits.

The claimants, members of the Bakery and Confectionery Workers' International Union of America, AFL-CIO, Local 492, are production and maintenance

---

[1] See Act of June 2, 1937, P. L. 1198, §3, 43 PS §206c (c).

employes of the Philadelphia bakery of the National Biscuit Company.

On Monday, June 17, 1957, one hundred five[2] of the female employes working on the "Deluxe" line in the icing department stopped work at 1:15 p.m., as the board found, "because they felt that the plant was too hot to continue working without some form of relief from the heat." These workers remained at their stations, however, but performed no further work; as a result the cakes on the belt line fell to the floor and caused the employer to stop the belt line operation. Committees for the union and management met to discuss whether the employes would return to work. The union committee requested more fans, additional breaks, and other forms of relief. The employer promised to make every effort to install eleven additional fans, and informed the union that the fans were en route from Chicago and were expected momentarily. All other employes continued to work on June 17, 1957. On Tuesday, June 18, 1957, the female employes on the "Deluxe" line reported to work but refused to perform their assignments. As the day progressed the employes on the various other lines stopped working; and by 2 p.m. all production lines were stopped. The employes stayed on the premises until 3:15 p.m., quitting time, but performed no further work. The stoppage of these various lines caused more of the employer's products to fall to the floor and all operations were suspended. Spoilage and loss of products and materials during Monday and Tuesday, June 17th and 18th, totaled approximately $41,000. In order that the accumulation of ruined bakery products caused by the work stoppage could be cleaned up, and in order that new dough could be prepared for the bakery to resume operations, the

---

[2] There is testimony that two of the girls went over to work on another job.

employer, about 3:10 p.m. on June 18th, posted the following notice:

"There will be work for the 3:00 P.M. and 11:00 P.M. shifts today. There will be work for all male personnel of the 7:00 A.M. shift tomorrow, Wednesday, June 19, 1957.

"Thereafter, there will be no further work until further notice.

"This condition will continue until a satisfactory agreement has been reached between the Union and the Management.

"A meeting has been arranged between the representatives of the Union and the Management for 9:30 A.M., Wednesday, June 19, 1957."

The female employes on the second and third shifts of June 18th refused to work; on Wednesday, June 19th, a few male employes reported for work for the 7 a.m. shift.

The collective bargaining agreement between the union and the employer contained a provision which stated: "There shall be no strikes declared by the union and no lockouts of its employees by the company during the life of this Agreement." The agreement was effective from September 1, 1955, to August 31, 1957. The bakery is constructed to operate on an integrated basis from the baking process to packing; in this respect all operations must work together at the same time or the entire process is inoperative.

On Wednesday, June 19th, a meeting was held between the employer and the union representatives. At this meeting the union insisted upon additional fans over and above the eleven fans which had then arrived, additional relief periods, and additional employes to provide relief for the present employes. The employer declined to make any concessions unless the employes returned to work under the same conditions, which had

previously prevailed, except for the eleven fans which had arrived. On Friday, June 21st, another meeting was held at which the employer stated that the plant would be opened for work on Monday, June 24th, and requested that the union give some assurance that, in the future, if there were new grievances or complaints by employes concerning working conditions, such matters would be processed in accordance with the grievance procedure set forth in the contract. The union held a meeting that evening and decided not to return to work. The following day, June 22d, the employer notified all employes that operation of the plant under the provisions of the contract was ready to be commenced. On June 28, 1957, at the office of the United States Conciliation Service, the union agreed to recommend to the members that they return to work under the same conditions as those which prevailed at the time of the stoppage, except for the additional eleven fans. The employer agreed to make a further study and supply additional fans wherever needed. The union membership voted on Friday, June 28, 1957, to return to work, and work was resumed on Monday, July 1st.

On the basis of these facts the board concluded: "In this case the employees voluntarily chose to withhold their services on June 17, 1957 in an effort to force the employer to comply with their desires for changes in working conditions. It was the act of the employees in refusing to perform their duties which caused the work stoppage and the responsibility for said work stoppage rests upon the claimants. In the instant case the claimants could have continued working under the existing terms and conditions of employment. Under these circumstances the work stoppage must be classed as a strike and the claimants are ineligible to receive benefits."

The conclusion of the board denying benefits is supported by its findings, based on competent and substantial evidence, and is consistent therewith. " 'A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is attained, that is, until the employer grants the concession demanded:' " *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 560, 83 A. 2d 386, 390. See, also, *Allman Unemployment Compensation Case,* 187 Pa. Superior Ct. 416, 420, 144 A. 2d 852. It is evident that on June 17th certain employes refused to perform their work assignments at their work stations, unless and until the employer made the desired concessions. The same conditions prevailed the following day, June 18th, when the work stoppage became generalized. By June 19th the work stoppage was complete except for a few employes. Although the employer continuously offered to resume work upon the pre-existing terms and conditions of employment, with the addition of the eleven fans, the employes refused to return to work until further concessions were made.

Claimant argues that the board arbitrarily and capriciously disregarded evidence of the employer's refusal to unconditionally resume operations. It is argued that by 4 p.m. on the afternoon of Tuesday, June 18th, every request, suggestion, or demand of the employes had been met by the employer, but that the employer insisted on posting a notice that no further work would be available until a satisfactory agreement had been reached. This contention ignores the time element involved and the circumstances of the posting of the notice. The written notice was posted at approximately 3:10 p.m. on Tuesday, according to the findings of the board, approximately fifty minutes *prior* to the time claimant asserts that the demands of the employes had been met. Moreover, although the

notice called for work on the next three shifts, the employes refused to work. Certainly the labor dispute was not settled by 4 p.m. as claimant asserts. The posting of the notice was the employer's recognition of the employes' refusal to work unless the dispute was fully settled to their satisfaction. The action of the employer was reasonable. See *Lavely Unemployment Compensation Case,* 166 Pa. Superior Ct. 481, 72 A. 2d 300; *Hughes Unemployment Compensation Case,* 187 Pa. Superior Ct. 252, 260, 144 A. 2d 685. Furthermore, on June 19th, June 21st, and June 22d, the employer offered to resume operations on the basis of the prior prevailing terms and conditions and in accordance with the subsisting contract, but the employes refused.

The conclusion is obvious that the work stoppage was initiated by, and continued at, the insistence of the employes who desired additional concessions from the employer in the working conditions.

It is argued that the several offers of the employer to resume work under the terms and conditions which previously prevailed were conditioned upon the signing of a supplemental assurance by the union that there would be no more strikes of this nature. The testimony indicates that the signing of such an assurance was not a condition upon which the plant would reopen. In only one instance, Friday, June 21st, did the employer request the union to give some assurance that these strikes, which were prohibited under the contract, would not be repeated. But it is clear from the evidence and from the findings of the board that all of the offers made by the employer to resume operations were upon the basis of the same terms and conditions of employment which prevailed at the time of the work stoppage and in accordance with the existing contract. In view of the arbitrary work stoppage by the em-

ployes and the substantial and wasteful loss directly resulting therefrom, it would be reasonable for the employer to expect that the strike and waste should not be repeated.

The request that a full working force be supplied on resumption of work would also appear to be reasonable, and apparently essential, because of the integrated nature of this bakery operation.

Claimant next argues that she and her fellow employes did not participate in a work stoppage within the meaning of the Law. It is argued that, although the strike was contrary to the provisions of the contract, the work stoppage was justified because of the feeling of discomfort experienced by certain employes due to the heat. The board, however, after consideration of the voluminous testimony introduced on these claims, did not so find. See *King Unemployment Compensation Case,* 183 Pa. Superior Ct. 629, 133 A. 2d 581. Moreover, the heat could not have been as injurious to health as claimant contends since the employes remained at their work stations on June 17th and 18th, but simply refused to work. In fact, on June 17th, employes other than those on the "Deluxe" line continued working. Employes are properly denied compensation when the facts demonstrate, as here, that they were unemployed through their own fault.

It clearly appears from the entire record that the responsibility or fault for the work stoppage was on claimants. Their action constituted a strike and their unemployment was not due to a lockout. See *Hogan Unemployment Compensation Case,* supra, 169 Pa. Superior Ct. 554, 560, 561, 83 A. 2d 386; *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 100, 132 A. 2d 749.

The decision of the board is affirmed.