Dydo Unemployment Compensation Case.
Glen Alden Corporation, Appellant, *v.* Unemployment Compensation Board of Review.

Argued March 3, 1959. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN and WATKINS, JJ.

*Franklin B. Gelder,* with him *Joseph L. Reynolds, III,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee

*John T. J. Brennan,* with him *Paul A. McGlone,* for claimant, intervening appellee.

OPINION BY WOODSIDE, J., April 16, 1959:

This is an appeal by an employer from a decision of the Unemployment Compensation Board of Review allowing unemployment benefits.

John V. Dydo was employed as a mine worker at the Wanamie Colliery of the Glen Alden Corporation. He was a member of the United Mine Workers of America which is the collective bargaining agent for the mine workers employed by Glen Alden. In the language of the board, ". . . on May 9, 1956 the union ordered a work stoppage because the company failed to remit payments to the [Health and Welfare] Fund . . . The work stoppage remained in effect until May 24, 1956, at which time the company made up the delinquent payments in full."

Dydo filed a claim for benefits covering this period. The claim was allowed by the bureau, but upon appeal, it was denied by the referee, and upon further appeal, it was allowed by the board. This case governs several thousand claims of employes involved in the same work stoppage.

The Health and Welfare Fund was established on June 7, 1946, by agreement of the union and the anthracite operators for the purpose of making payments therefrom to mine workers and their dependents for sickness, disability, death, and retirement.

The fund is administered by three trustees, two of whom were originally appointed by the president of the union and one by the anthracite operators, but who are now designated as one chosen by the union, one by the operators and the third by the other two. The operators at the time of the "work stoppage" had agreed to pay monthly into the fund 50¢ per ton of coal produced for use or sale. The Glen Alden Corporation had been paying the agreed sum until January 1956, but did not make the payments due for January,

February and March of 1956, amounting in the aggregate to $542,919.92. When the employer failed to comply with the union's request to pay the delinquent account, the union "ordered a work stoppage."

There was evidence presented that the reason the Glen Alden Corporation defaulted in the payments was because there were upwards of twenty of its competitors delinquent in their payments to the fund for various periods, some since 1952 and some owing more than Glen Alden did on May 9, 1956. It was contended by Glen Alden that no serious effort was being made to collect from its defaulting competitors. As this relates to the merits of the labor dispute, with which we are not directly concerned in an unemployment compensation case, we place no importance upon this evidence. The justification for the act of the employer which precipitated the strike or the justification for the demands of the employes is generally not considered in compensation cases. *Hughes Unemployment Compensation Case*, 187 Pa. Superior Ct. 252, 259, 144 A. 2d 685 (1958); *Leto Unemployment Compensation Case*, 176 Pa. Superior Ct. 9, 15, 106 A. 2d 652 (1954); *Hogan Unemployment Compensation Case*, 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386 (1951).

The board found that there was a labor dispute, but that the claimant was locked-out.

Section 402(d) of the Unemployment Compensation Law, 43 PS §802(d), as amended, provides in part, "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (*other than a lock-out*) at the factory, establishment or other premises at which he is or was last employed: . . ." (Emphasis supplied)

The board made no finding as to whether or not work was available for the claimant during the period

in question, but the referee found that had he reported for work, it was available and that this fact was adequately publicized.  As the evidence shows a stipulation of counsel agreeing to this as a fact, we, of course, can accept it as such.  Indeed, except as to what operators were delinquent in their payments, how much they owed, and what had been done to collect the arrearage, all of which we are ignoring entirely in our present consideration, there is no dispute over the facts.

When the board finds for the claimant, the test upon appellate review is whether the board's findings and decision are supported by substantial competent evidence.[1]  *Hamilton Unemployment Compensation Case,* 172 Pa. Superior Ct. 413, 414, 92 A. 2d 63 (1953).

But where a finding of fact is simply a deduction from other facts reported by the tribunal under review, and the ultimate fact in question is purely the result of reasoning, an appellate court is competent to judge of its correctness and should draw its own conclusions from the facts as reported.  *Publicker Estate,* 385 Pa. 403, 410, 123 A. 2d 655 (1956); *Dorrance's Estate,* 309 Pa. 151, 156, 163 A. 303 (1932); *Carr Estate,* 371 Pa. 520, 528, 92 A. 2d 213 (1952);

---

[1] When the board finds against the claimant who has the burden of proof, the test on appellate review is whether the board's findings of fact are consistent with each other and with its conclusions of law and its order, and can be sustained without a capricious disregard of competent evidence. *Hamilton Unemployment Compensation Case,* 181 Pa. Superior Ct. 113, 117, 124 A. 2d 681 (1956). This is the general rule of appellate review when state boards and commissions find against the person having the burden of proof. The rule that the decision must be supported by substantial competent evidence cannot be logically applied when the decision is against the person with the burden of proof because there may be *no* credible evidence before the fact finder on an issue which must be proved to make out a case. A decision against a claimant may be supported by the *absence* of credible evidence.

*Smith v. Smith,* 364 Pa. 1, 5, 70 A. 2d 630 (1950);
*Quein Will,* 361 Pa. 133, 152, 62 A. 2d 909 (1949);
*Brooks v. Conston,* 356 Pa. 69, 71, 51 A. 2d 684 (1947);
*Blue Ridge Metal M. Co. v. N. Pa. P. Co.,* 327 Pa. 424,
432, 194 A. 559 (1937); *Sellers & Co. v. Clarke-Harrison, Inc.,* 354 Pa. 109, 118, 46 A. 2d 497 (1946); *Estate of Martina R. Nixon,* 104 Pa. Superior Ct. 506,
509, 159 A. 172 (1932); *Rothsville Knitting Mills Assigned Estate,* 49 Pa. Superior Ct. 208, 211 (1912).

If it is necessary to apply this rule on the scope of appellate review to the decisions of courts learned in the law, as was done in the above cases, it is doubly important to apply the rule to the decisions of the numerous state boards and commissions composed largely of officials who are not learned in the law, able and devoted as they may be.

Did the employer lock out the claimant? "Strikes and lock-outs are economic weapons. 'A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is attained, that is, until the employer grants the concession demanded:' Restatement, Torts, §797, Comment a. 'A lockout is an employer's *withholding of work* from his employees in order to gain a concession from them. It is the employer's counterpart of a strike . . .': Id., §787, Comment a. (Emphasis added)" *Hogan Unemployment Compensation Case,* supra, 169 Pa. Superior Ct. 554, 560, 83 A. 2d 386 (1951).

Did the employer withhold work from its employes?

It is our duty to construe words and phrases contained in statutes according to their common and approved usage. Statutory Construction Act of May 28, 1937, P. L. 1019, §33, 46 PS §533. Statutes are presumed to employ words in their popular sense. When words are susceptible of more than one meaning, the popular meaning should prevail. *Commonwealth v.*

*Bay State Milling Co.,* 312 Pa. 28, 31, 167 A. 307 (1933). "Lock-out" as used in the Unemployment Compensation Law could not in its common and approved usage include this work stoppage "called" by the union.

Using words in common and approved usage, one would not say that the employer withheld work from its employes when it did not pay the welfare fund on time. Except as it has become important in unemployment compensation cases, no person would think of referring to what happened here as a lockout. Everyone would call it by what it is—a strike. Esoteric interpretations should not be given to the language of statutes which is understandable in ordinary English.

It is interesting to note that in spite of the meticulous care which claimants, their witnesses, and their lawyers evidently take in unemployment compensation hearings to avoid calling the work stoppage "a strike," they cannot avoid referring to it and similar work stoppages by what everyone recognizes them to be— "strikes". In this case counsel for the claimant in stipulating facts said, "District President, August Lippi had called a *strike* or called a stoppage, not a strike, a stoppage of work . . ." Look at the testimony of the man who called the "strike": "1951 I *struck* the Pagnotti interests, No. 9 Colliery, No. 16 Colliery, Harry E and Forty Fort Colliery. I had a one day stoppage there to compel him to pay to the Health and Welfare Fund. I *struck* previous to *this strike* the Valley View Coal Company on at least three or four previous occasions. I *struck* the Pioneer Coal Company on two different occasions to compel payments to the Health and Welfare Fund. I *struck* the Old Forge Coal Company on two or three different occasions to collect payments to the Health and Welfare Fund and the Packer Coal Company operated by

Adonizio boys. I *struck* them two different occasions, all previous to the action taken against the Glen Alden Coal Company." and again as to this work stoppage, "After the *strike* was called off . . ." and again, "my information is that the Susquehanna Collieries Company made a complete payment some week or so before the *strike* was called off."

Of course, what counsel, witnesses, or parties called the work stoppage does not determine whether it was a strike or a lockout. Their testimony does show, however, that in choosing the expression to apply to the situation "strike" is normally used, and that lockout according to its common and accepted use would not be applied to a work stoppage such as occurred here.

The law concerning lockouts has been so extensively reviewed by this Court during the past year, that it would serve no useful purpose to repeat all the applicable principles set forth in the *Westinghouse, Eric Forge,* and *Punxsutawney Company* cases,[2] We might point out, however, that we have repeatedly said that the duty of the compensation authorities is to determine whether the employes are unemployed through no fault of their own. If the employes have acted consistently with the desire to remain employed, they are entitled to compensation under the Unemployment Compensation Law to alleviate the economic burdens commensurate with unemployment.

We have also frequently stated that although employes may have been justified in refusing to work for

---

[2] *Hughes, Accurti, McCracken, Allman* and *Gray Unemployment Compensation Cases,* 187 Pa. Superior Ct. 252; 391; 403; 416; 425; 144 A. 2d 685, 673, 679, 852, 856; allocaturs refused December 26, 1958. *Vrotney Unemployment Compensation Case,* 188 Pa. Superior Ct. 405, 146 A. 2d 751 (1958), allocatur allowed March 18, 1959; *Parise Unemployment Compensation Case,* 188 Pa. Superior Ct. 569, 149 A. 2d 683 (1959).

collective bargaining reasons, this does not make the work stoppage a lockout. Strikes may frequently be "justified", but they are strikes, nevertheless, and those engaged in them are ineligible for unemployment compensation under the provisions of section 402(d) of the Law, supra.

The claimant here had an opportunity to continue his employment while the trustees of the fund could collect by suing the employer. The union itself, on behalf of the claimant, set forth in this case that the employer was financially responsible and able to pay the sum which the union claims was admitted by the company to be due, and for which suit could be brought against the corporation. The union's excuse for "calling a work stoppage" was that a lawsuit would take too much time.

"The employes are required to avail themselves of contractual, legal, or equitable remedies for the settlement of disputes with their employers, without any cessation of work, in preference to the creation of a status of unemployment. The Unemployment Compensation Law was not intended to promote work stoppages. (Citing)" *Accurti Unemployment Compensation Case,* 187 Pa. Superior Ct. 391, 396, 397, 144 A. 2d 673 (1958).

The claimant and his fellow employes could have worked with the same wages and under the same working conditions as existed when their union called them off their job. As stated in the *claimant's* brief: "In our case we have no dispute over wages, conditions of employment, etc. The money paid by the employer as royalty is not wages. (Page 143 of Joint Exhibit 1 (101a)). The employer does not pay federal insurance premium on said royalty payments. The payments of royalty are not paid to the employees."

In *Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 100 A. 2d 396 (1953) we held that the claimant whose union called a work stoppage in order to compel compliance by the employer with its obligation under the contract to make payments to a health and welfare fund was not entitled to unemployment compensation because the work stoppage was a strike and not a lockout. There is no significant difference between that case and the one now before us.

The union here called a strike. The employer did not withhold work from the claimant. The claimant's unemployment was due to a stoppage of work existing because of a labor dispute (other than a lockout) and he is, therefore, made ineligible for compensation under section 402(d) of the Unemployment Compensation Law, supra, 43 PS §802(d).

Decision reversed.

