Burleson Unemployment Compensation Case.

Argued March 19, 1953. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, GUNTHER and WRIGHT, JJ.

*Max Rosenn, with him Rosenn & Rosenn* and *Harold Rosenn,* for appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for appellee.

*Edward Darling,* with him *Bedford, Waller, Darling & Mitchell,* for American Chain & Cable Company, Inc., intervenor, appellee.

OPINION BY RENO, J., July 14, 1953:

Claimant Burleson,[1] an employe of the West Pittston Plant of the American Chain and Cable Company, Inc., intervening appellee, filed two separate appeals from two adverse decisions of the Unemployment Compensation Board of Review. The first (No. 49 October Term, 1951) involves a claim for benefits for the week ending January 29, 1950. The second (No. 12 February Term, 1953) relates to claims for 17 weeks from February 5 to May 28, 1950. The Board refused all the claims in accordance with the Unemployment Compensation Law, §402(d), 43 P.S. §802: "An em-

---

[1] By agreement of the parties, the decisions on these appeals will be binding upon the claims of all claimants.

ploye shall be ineligible for compensation for any week
—(d) In which his unemployment is due to a stoppage
of work, which exists because of a labor dispute (other
than a lock-out) at the factory, establishment or other
premises at which he is or was last employed: . . ."

I. *Labor Dispute.* Unquestionably there was a
stoppage of work. It commenced on December 9, 1949
and continued until May 25, 1950. The work stoppage
existed because of a labor dispute and, as will be
demonstrated, not because of a lock-out. These state-
ments summarize the Board's findings, and they are
amply supported by the evidence.

Claimant and 189 fellow-employes were members
of Local No. 4150 of the United Steel Workers of Amer-
ica, C. I. O. A collective bargaining contract, called
the Basic Agreement, covering wages and working con-
ditions, had been executed on September 1, 1948 be-
tween the Company and the national officers of Steel-
workers and the officers of the Local. This contract
expired one year after its date and on August 25, 1949,
it was extended until such time as either party should
give 15 days' written notice of an intention to modify
or terminate it. The extension contract was also exe-
cuted by the Company, the national officers of the
Steelworkers, and the officers of the Local.

On November 17, 1949, Philip Murray, national
president of the Steelworkers, and the Company exe-
cuted a contract which was intended as an extension
of the term of the September 1, 1948 agreement to De-
cember 31, 1951, and provided a pension and insurance
program.[2] The effect of the contract was to freeze the
wage scale contained in the basic agreement until the

---

[2] The contract signed by Murray and the Company (Employer's
Exhibit D) refers to an agreement dated May 10, 1947 as amended
on July 27, 1948, as "The Basic Agreement". The copy of the
contract submitted to the Local which it refused to execute (Em-

expiration date. The November 17th contract was submitted to the Local and the copy indicated the places where the officers of the Local were to sign it. The Local refused to execute it and requested the Company to enter into negotiations for an increase of wages as of November 17, 1949. The Company refused, and on December 11, 1949, the Local voted to strike.

The Board's findings as to the effect of the November 17th contract are not explicit but they indicate that its effect was to modify the basic agreement and to continue the wages therein stipulated to December 31, 1951,[3] and considerable of the argument here revolved around this point.

The Constitution of the Steelworkers, Art. XVII, §3, provides: "The International Union *and the Local Union* to which the member belongs shall act exclusively as his agent to represent him in the presentation, maintenance, adjustment and settlement of all grievances and other matters relating to terms and conditions of employment or arising out of the employer-employee relationship." (Emphasis added.) Since the Local Union did not execute the November 17th contract, as required by the Constitution and according to the practice established by the previous collective bargaining agreements, it cannot be said that the November 17th contract bound the Local.[4]

---

ployes' Exhibit F) designates the agreement of September 1, 1948, as "The Basic Agreement."

[3] The finding of the Board upon this point follows: "6. . . . The local then requested that the company continue the negotiations commenced before the expiration date of the contract signed September 1, 1948. This the company refused to do *since it already had a contract with the union as a result of the Page contract and memorandum, both dated November 17, 1949, which bound the company.*" (Emphasis added.)

[4] After the employes picketed its plant the Company secured a temporary injunction which was subsequently dissolved. The

However, that question is not before us and we express no opinion upon it. The Board's findings and the contentions relating to the effect of the November 17th contract are completely irrelevant in this context. Whether or not the basic agreement remained in force, the work stoppage nevertheless resulted from a labor dispute. If the basic agreement and the wages therein stipulated were binding upon the Local, its strike was a violation of the agreement. If the basic agreement was not validly extended or was terminated by the action of the Local, the work stoppage was nevertheless a strike. "[A] concerted cessation of work after the expiration of a collective bargaining agreement, in the absence of other and qualifying circumstances, is a strike": *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 563, 87 A. 2d 801.

As stated, there can be no doubt that the work stoppage resulted from a labor dispute. The controversy between the employes and the Company related to wages, the employes seeking an increase of the wages provided in the basic agreement, and the Company standing upon that agreement and refusing the increase. While the Law does not define "a labor dispute", a demand for increased wages and a refusal thereof is most certainly a labor dispute, a controversy concerning the terms and conditions of employment. Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, §3(c), 43 P.S. §206c; Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, as amended, §3(h), 43 P.S. §211.3. Burleson can hardly contend otherwise. In his initial application for benefits he

Chancellor, President Judge VALENTINE of the Court of Common Pleas of Luzerne County, held that the agreement of November 17th, not having been executed by the Local, did not bind it. *American Chain and Cable Co. v. United Steelworkers,* 43 Luz. Leg. Reg. Reports 47.

certified, "I am unemployed because: Dispute over wages." And all the evidence, which need not be further reviewed, conclusively shows that he and his fellow employes were engaged in a labor dispute, a controversy concerning wages, which caused the work stoppage and resulted in a strike.

II. *Lock-Out.* The Board found: "11. The West Pittston Plant was open for operation during the period in question and the company had work to be done and at all times was ready and willing to allow the claimant to work under the same terms and conditions as existed on or before Friday, December 9, 1949."

It also formulated additional findings: "8. The claimant [Burleson] as of his last day of work was being paid at the rate of $1.15 per hour and the employer was willing at all times throughout the period here involved to permit him to return to work under the same wages and other working conditions as had existed prior to December 9, 1949. Under the terms of the contract as finally negotiated [on May 25, 1950] he was granted a 12¢ per hour increase in wages. Management during the month of January 1950 had, in fact, sent letters to all the employes requesting that they return to work and listing therein the date and specific hour when the individual employe was to report for work. Frequently during the period of the work stoppage management had advised individual employes upon inquiry that the doors were open and they could return to work at any time that they so desired under the terms of the old contract."

"9. There was no change in the status of the claimant's employment during the period here involved and said unemployment remained due to the action of the employes in voluntarily suspending operations on or about December 11, 1949."

The Board further found that at meetings between the Company and representatives of the employes the latter offered to return to work but always upon specified conditions. One condition was that a new wage-scale be negotiated and that any increase thereof be retroactive to the date of return. Alternative proposals required submission of the controversy concerning wages to arbitrators, nominated by the employes. Until the arbitrators entered an award, the employes would work in the plant but at rates of wages to be subsequently determined by the arbitrators. The evidence upon this phase of the case is contradictory but the Board's findings have substantial evidential support and are therefore binding upon us. At all events, the employes did not return to work although work was available.

The gist of a lock-out is an employer's withholding of work from his employes in order to gain a concession from them. It may be evidenced by closing the plant or by other acts which evince the purpose of forcing employes to accept onerous terms of employment. But where, as here, the plant remains open, the employes are requested to return to work, and full employment is available to all employes at the wages and on the terms of employment prevailing at the time the work stoppage occurred, a labor dispute or a strike is not transformed into a lock-out. *Hogan* case, supra.

III. *Unfair Labor Practices.* Appellant charges that the Company violated the Pennsylvania Labor Relations Act, supra, §6, 43 P.S. §211.6, which provides: "(1) It shall be an unfair labor practice for an employer—(e) To refuse to bargain collectively with the representatives of his employes, . . ." There may be substance to the contention. Sometime after December 12, 1949, Local No. 4150 disaffiliated from the Steelworkers, became an independent union and, under an election su-

pervised by the National Labor Relations Board, was certified as the exclusive bargaining agent for the employes at the plant. The Company, still insisting that its November 17th contract bound its employes, indicated at least a reluctance to enter into negotiations with the independent union.

Appellant's contentions invite us to enter a forbidden domain. Neither the Board nor this Court can base an award of compensation benefits upon a finding that an employer has not fulfilled his obligation to bargain collectively. Proof of a violation of the Act will not support an award. Nor will such proof support a finding of a lock-out unless it also shows a withholding of work, as herein stated.

The remedy for the refusal to bargain collectively is an award of "back pay". Pennsylvania Labor Relations Act, supra, §8(c), 43 P.S. §211.8; Taft-Hartley Labor Management Relations Act, 1947, §101(c), 29 U. S. C. A. §160.[5] Our Unemployment Compensation Fund consists of the contributions of all employers and it cannot be drawn upon to pay for the unfair labor practices of any one employer. His liability is fixed as payment of back pay by the very statute which denounces the practices, and thus provides the exclusive financial remedy for his dereliction. *Hogan* case, supra.

Decisions affirmed.

---

[5] The National Labor Relations Board conducted the election after which the independent union was certified as the collective bargaining agent. This would indicate that the Taft-Hartley Act was applicable. See *Garner v. Teamsters, Chauffeurs and Helpers, Local Union No. 776,* 373 Pa. 19, 94 A. 2d 893.