---

Westinghouse Electric Corporation *v.* Unemployment Compensation Board of Review (No. 2). McCracken Unemployment Compensation Case.

404

Argued June 13, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John G. Wayman,* with him *Elder W. Marshall, James H. Hardie, W. D. Armour,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Benjamin C. Sigal,* for appellees-intervenors.

OPINION BY RHODES, P. J., September 11, 1958:

Claimants and the employer, Westinghouse Electric Corporation, have appealed from a decision of the Unemployment Compensation Board of Review. The board affirmed the referee's decision, refused compensation to claimants for the period of a work stoppage determined to be a strike, and granted compensation for the period of the work stoppage determined to have been converted into a lockout.[1] The claimants contend that the entire work stoppage was due to a lockout; Westinghouse contends that the entire work stoppage was a strike.

Claimants are members of three locals of the International Union of Electrical, Radio and Machine Workers, CIO (IUE), employed at plants of the Westinghouse Electric Corporation in Pittsburgh, Sharon, and Philadelphia.[2] On October 16, 1955, the employes became unemployed due to a work stoppage resulting from a labor dispute between Westinghouse and IUE. The collective bargaining agreement in effect between the company and the union provided for an indefinite term subject to being terminated as of midnight October 14, 1956, upon sixty days' written notice by either party. Section XVIII, paragraph 9 of the national agreement provided, however, that: "Notwithstanding any other provisions of this Agreement, either party

---

[1] The Bureau of Employment Security had made the same determination.

[2] In Pittsburgh, including the plants at East Pittsburgh, Trafford, Linhart, Turtle Creek, and Homewood, there are approximately ten thousand employes involved, represented by Local 601 of the IUE; at Sharon there are approximately six thousand employes represented by Local 617 of the IUE; at Philadelphia there are approximately two hundred employes represented by Local 111 of the IUE.

may reopen this Agreement once, at any time between September 15, 1955 and November 15, 1955, inclusive, for the limited purpose of requesting, in writing, a general adjustment in wages and salaries (meaning only a general adjustment to all employes covered by this Agreement in terms of cents per hour, a percentage of pay or a graduated increase in the form of the general increases between 1951 and 1954, inclusive, and not including any other change, addition, increase or decrease in economic benefit to employes of any other nature whatsoever) . . . Any matters, other than general wage and salary adjustments, involving rates of pay, wages, hours of employment or other conditions of employment of employes covered by this Agreement may be presented by either party to the other party during such reopening, but they shall be the subject of negotiation during such reopening only by mutual agreement between the Company and the Union for their consideration, and the Union shall not have the right to strike with respect thereto."

On September 2, 1955, the president of the union addressed a letter to the company stating: ". . . the Union desires to reopen the Agreement for the purpose of negotiating a general adjustment in wages and salaries for all covered employees."

The negotiating committees of the union and the company held numerous meetings between September 15, 1955, and October 14, 1955. Prior to the beginning of the negotiations the parties mutually agreed in writing that in addition to a general wage and salary adjustment the parties would negotiate the contractual provisions covering studies of day worker operations.[3] In the course of the negotiations the union

---

[3] The survey or study of day workers had resulted in a work stoppage on August 1, 1955, which was settled on September 15, 1955, when operations began to be resumed. The unemployment

proposed an increase of 15 cents per hour for all employes and also submitted that the time study issue be arbitrated. On September 29, 1955, the company offered a package proposal on a five-year basis which contained provisions for wage increases, changes in the insurance and pension agreement, changes in vacations, and other changes in the terms and conditions of employment. The union rejected this package proposal, and stated that the company was violating the existing agreement by expanding negotiations beyond the scope of the reopening clause (section XVIII, paragraph 9) of the agreement to include matters other than a general adjustment in wages and salaries and the survey of day worker operations which were specifically agreed to be included in the negotiations. Subsequent negotiations were fruitless and the employes voted to stop work as of midnight October 16, 1955.

The board found that work was available for the employes on October 17, 1955, on the same terms and conditions as had existed prior to the work stoppage. Negotiations continued after October 17, 1955. On December 5, 1955, the company proposed that the employes return to work under the pre-existing terms and conditions while negotiations continue; the union rejected the proposal, and submitted a counter proposal to return to work on conditions which were different than the existing terms and conditions of employment. This proposal was rejected by the company.

On December 19, 1955, Honorable George M. Leader, Governor of the Commonwealth, sent a telegram to

---

compensation claims resulting from the work stoppage due to the survey are involved in the case of *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 1)*, *Accurti Unemployment Compensation Case*, 187 Pa. Superior Ct. 391, 144 A. 2d 673.

the Westinghouse Electric Corporation and to the International Union of Electrical, Radio and Machine Workers, CIO (IUE), evidencing his concern over the protracted work stoppage and the growing bitterness between the parties. The Governor proposed that: "Under these circumstances, and because of our earnest desire to see industrial peace restored in Pennsylvania, particularly this season of the year, we urge the union and the company to submit their dispute to final and binding arbitration. While this arbitration is proceeding the employes would be back at work. We appeal to the leaders on both sides as men of good will to accept our proposal." The president of the union (IUE) replied to the telegram to the effect that "the union accepts your recommendation without reservation." The president and chairman of Westinghouse Electric Corporation replied, expressing his sincere appreciation for the Governor's interest in the strike. He rejected the proposal to arbitrate the dispute because management felt that to submit the question of a wage increase and matters incident to collective bargaining to a third party would be an abdication by management of its responsibilities and a delegation to a third party of decisions which would affect the competitive standing of the company for several years. In fact, the company considered this labor dispute was not of the type which could be properly submitted to arbitration. On December 21, 1955, the union made known to the company the willingness of the employes to return to work, as the board found, "in accordance with the telegram sent to Governor Leader by its President, James B. Carey." Negotiations continued between the parties, and on March 26, 1956, the dispute was settled and the employes returned to work on March 28, 1956.

That the unemployment was due to a labor dispute is not questioned. From the facts the board first concluded that the work stoppage in its inception was a strike, and that the employes were not entitled to benefits. The board further concluded, however, that after December 19, 1955, when the company refused to arbitrate the dispute in accordance with the Governor's telegram, the work stoppage for the weeks thereafter was the result of a lockout.[4]

The question raised on the appeal of claimants (No. 38, April Term, 1958) is whether the final cause and responsibility or fault for the initial work stoppage was upon the employes; on the appeal of the company (No. 34, April Term, 1958) the question raised is whether the work stoppage, if initially a strike, was converted into a lockout when the company refused to accept the proposal of the Governor.

We agree, as the board concluded, that the work stoppage was initially a strike, and that claimants were ineligible for benefits. Where the company and the union are in the process of negotiating a new collective bargaining agreement, in whole or in part, as here, and the employes strike in order to gain a concession from the employer in connection therewith or because they do not agree with the proposal submitted by the employer for the new contract, the employer having work available for the employes upon substantially the same terms and conditions of employment as under the old contract, the resulting unemployment is attributable to the employes and benefits are not allowable. See *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review, Hughes Unemployment Compensation Case,* 187 Pa.

---

[4] See *Pennsylvania State Chamber of Commerce v. Torquato,* 386 Pa. 306, 125 A. 2d 755, as to payment of claims.

Superior Ct. 252, 144 A. 2d 685. That is descriptive of this situation. The collective bargaining agreement was reopened by the action of the union; and, pending its re-negotiation with respect to a general wage adjustment and settlement of the problem of the survey of day workers, there was employment available to the employes upon the same terms and conditions of employment as existed prior to reopening the contract. There was no act or action on the part of the company which precipitated the strike except its proposal proffered in connection with the negotiation of the reopened contract. The proposal of the company did not in any way affect the existing terms and conditions of employment pending settlement of the dispute; it was merely offered in the negotiations and affected only the proposed contract.

It is contended, however, that the final fault for the work stoppage at its inception lies with the company because, in the course of the negotiation of the general wage adjustment, it offered a package proposal on a five-year basis. This contained not only wage adjustments but proposed changes in other terms and conditions of employment which it is argued were improperly made part of the negotiation under section XVIII, paragraph 9 of the national agreement. If the company exceeded the scope of the reopened negotiations contrary to the provision of the contract this action would at most be a breach of the contract for which the employes would first be obliged to resort to any contractual, legal, equitable, or administrative remedies before choosing a status of unemployment. *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 1), Accurti Unemployment Compensation Case*, 187 Pa. Superior Ct. 391, 144 A. 2d 673. But the then terms and conditions of employment were not affected thereby. The

merits or reasonableness of the respective offers or demands of the parties relating to the matters which are the subject of the collective bargaining negotiations are not determinative of the compensation claims (*Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 16, 106 A. 2d 652; *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386); it is only the reasonableness of the action of the employer in not providing work pending negotiations or the reasonableness of the action of the employes in ceasing to work during negotiations which are relevant considerations. *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review, Hughes Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 252, 144 A. 2d 685.[5] Moreover, it would appear that the union contemplated a more general discussion than merely the general adjustment of wages and salaries. In the letter from the union to the company of September 2, 1955, in which the union called for a reopening of the contract, the union specifically stated: "During such reopening the Union will also present other matters, involving rates of pay, wages, hours of employment and other conditions of employment of employes covered by this Agreement." The right to present matters other than those relating to wages was expressly given by section XVIII, paragraph 9.

The claimants also claim that work was not available for them on the same terms and conditions of employment as had existed prior to the work stoppage

---

[5] "Whether or not an employer fulfilled his obligation to bargain collectively is not a question for the Board of Review. . . if an employer breaches the legal duty to bargain collectively, . . . the State's Unemployment Compensation Fund . . . is not liable for his dereliction." *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 562, 83 A. 2d 386, 391.

on October 16, 1955, because two and a half months earlier, on August 1, 1955, the company instituted a survey of its day workers, which the claimants contend was a breach of contract and materially changed the terms and conditions of their employment. Obviously, the survey made by the company was not the cause of the present labor dispute and the board did not so find. The labor dispute resulting from the survey was a prior matter which had resulted in a work stoppage from August 1, 1955, until September 23, 1955, at which time work resumed. Although the board allowed compensation on the claims filed by the employes in that labor dispute, we have determined that the employes were not eligible for compensation. *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 1), Accurti Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 391, 144 A. 2d 673. The making of the survey was at most a breach of contract for which the employes should have sought redress under the contract, in law or equity or through the administrative procedures. If the making of the survey did not form the basis for compensable unemployment at its inception, it could not do so subsequently when it had been temporarily settled and was currently the subject of negotiation between the parties. The board properly rejected this as a cause of the work stoppage.

Turning to the appeal of Westinghouse, the question is whether the work stoppage, while initially a strike, was converted into a lockout by the refusal of the company to accept the proposal of Governor Leader to arbitrate the dispute and permit the employes to return to work pending the arbitration. Each week of unemployment is the subject of a separate claim, the validity of which is determined by a consideration of conditions existing within that week; consequently a

work stoppage which is initially a strike may subsequently be converted into a lockout. *Burger Unemployment Compensation Case,* 168 Pa. Superior Ct. 89, 91, 93, 77 A. 2d 737. The board concluded that the company was responsible for the continuance of the work stoppage beyond December 20, 1955, because it rejected the proposal of the Governor that work be resumed, which proposal the union had accepted. However, the proposal of the Governor involved not merely the resumption of work but the submission of the dispute "to final and binding arbitration." This proposal the union accepted "without reservation." The company rejected the proposal on the ground that an acceptance would constitute an abdication of the duties and responsibilities of management. The willingness of the employes to return to work, therefore, was not conditioned entirely upon resumption of employment under the same terms and conditions as existed prior to the cessation of work on October 17, 1955; it was upon the further condition that the matter be submitted to arbitration, final and binding, as proposed by the Governor. The board found, in finding No. 20: "On December 21, 1955 the Union, through Mr. Nellis, made known to the Company its willingness to return to work *in accordance with the telegram sent to Governor Leader by its President, James B. Carey.*" (Italics supplied.) The refusal of the company to accept the proposal of the Governor was not simply a refusal to resume operations upon the pre-existing terms and conditions of employment, but a refusal to resume operations upon the pre-existing terms of employment pending arbitration. Under these circumstances the strike was not converted into a lockout. There was no obligation upon the company, contractual or otherwise, to submit this dispute to arbitration; its refusal to do so cannot support a finding of a lockout. *Morris Un-*

*employment Compensation Case,* 169 Pa. Superior Ct. 564, 568, 83 A. 2d 394; *Burleson Unemployment Compensation Case,* 173 Pa. Superior Ct. 527, 532, 98 A. 2d 762.

We have held that, where the employer is bound by the contract to arbitrate a particular dispute and he refuses to do so, the employes may not cease work and become entitled to benefits because of the refusal.[6] *Arbechesky Unemployment Compensation Case,* 174 Pa. Superior Ct. 217, 223, 100 A. 2d 396. From the beginning of the strike the company had work available for its employes upon the same terms and conditions of employment that previously existed; and, as late as December 5, 1955, the employes rejected a proposal of the company that they return to work under the pre-existing terms and conditions of employment while negotiations continued. Negotiations between the company and the union continued before and after the Governor's proposed arbitration. Consequently, the company's rejection of the Governor's proposal cannot support a conclusion that the company refused to permit the employes to return to work upon the pre-existing terms and conditions of employment pending negotiations to settle the dispute. It is clear that the Governor's proposal must be considered as a whole, including not only the resumption of work but the submission of the dispute to arbitration. The fact that the company determined that it could not delegate the power of negotiation to a third party does not support a conclusion that the company refused to permit the employes to return to work. The offer of the employes

---

[6] Employes have an adequate legal remedy to compel an employer to arbitrate in accordance with a collective bargaining agreement. *Amalgamated Association of Street, Electric Railway and Motor Coach Employes of America v. Pittsburgh Railways Company,* 393 Pa. 219, 142 A. 2d 734.

to return to work was conditioned upon the company's accepting the arbitration; it cannot be considered an unqualified offer to return to work pending settlement of the dispute by negotiation within the meaning of any of the cases. The refusal of an employer to accept specified conditions under which the employes would return to work does not constitute a lockout. *Burleson Unemployment Compensation Case,* supra, 173 Pa. Superior Ct. 527, 533, 98 A. 2d 762.

The decision of the Board of Review denying compensation for the weeks ending October 23, 1955, through December 20, 1955, is affirmed; the decision is reversed to the extent that it allows compensation for the weeks ending December 27, 1955, through February 20, 1956.

