Westinghouse Electric Corporation *v.* Unemployment Compensation Board of Review (No. 3). Allman Unemployment Compensation Case.

418

Argued June 13, 1958. Before Rhodes, P. J., Hirt, Gunther, Wright, Woodside, Ervin, and Watkins, JJ.

reargument refused October 9, 1958.

*John G. Wayman,* with him *Elder W. Marshall, Leonard L. Scheinholtz, James H. Hardie,* and *Reed, Smith, Shaw & McClay,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Thomas D. McBride,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*David Cohen,* for appellees-intervenors.

Opinion by Rhodes, P. J., September 11, 1958:

This unemployment compensation case involves approximately nine hundred fifty employes of the Westinghouse Electric Corporation at its plants in Derry and Nuttall, Pennsylvania, who became unemployed on October 25, 1955, due to a work stoppage involving

a labor dispute.[1]   The Board of Review concluded that the claimants were not entitled to unemployment compensation from the commencement of the work stoppage to December 19, 1955, but that thereafter, through February 20, 1956, the employes were entitled to benefits on the basis that the initial strike had been converted into a lockout on December 20, 1955.[2]   Claimants have appealed from that portion of the board's decision denying benefits; the company has appealed from that portion of the decision granting benefits.

Basically the issue here is the same as in *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 2), McCracken Unemployment Compensation Case,* 187 Pa. Superior Ct. 403, 144 A. 2d 679.   Our decision in those appeals is controlling on the appeals presently before us.   However, there are certain factual differences which require additional comment.

The collective bargaining agreement between the company and the union provided that it could be terminated on October 15, 1955, by sixty days' advance written notice given by one party to the other.   The agreement also provided that neither of the parties would request changes therein prior to August 15, 1955.   On August 15, 1955, the union requested negotiations concerning a general increase in wages and other changes in the agreement.   Negotiations began

---

[1] At the Derry plant there are approximately six hundred employees involved who are represented by Local 612 of the United Electrical, Radio and Machine Workers of America (UE) ; at the Nuttall plant there are approximately three hundred fifty employes represented by Local 601 of the United Electrical, Radio and Machine Workers of America (UE).

[2] The Bureau of Employment Security had made the same determinations.   The referee held that the unemployment for the entire period resulted from a labor dispute other than a lockout.

on August 31, 1955, and numerous meetings were held until October 25, 1955. The union desired a general increase in wages and certain improvements in working conditions. On September 29, 1955, the company offered a new contract which included a wage increase, improved vacations, insurance and pension benefits, and other matters on the condition that the union agree to a five-year term for the new agreement. The union rejected this offer, and negotiations continued without resolution of the differences between the parties. On October 25, 1955, the union notified the company that the employes intended to strike on October 26, 1955, because the company's proposals were unsatisfactory. The strike began at midnight on October 26, 1955. In December, 1955, the union offered a resumption of work if a wage increase was granted and negotiations were continued on other matters. The company rejected this proposal.

On the basis of the foregoing, the board concluded that the work stoppage beginning on October 26, 1955, was a strike because the ". . . employees voluntarily chose to withhold their services . . . in an effort to force the employer to comply with their desires for improved working conditions. Therefore it was the act of the employees in refusing to report for work which caused the work stoppage. . . . The same condition prevailed through the month of November and the early part of December because the union did not signify its willingness during that time to return to work on existing terms and conditions." The findings of the board support its conclusion to this point. " 'A strike is a concerted refusal by employees to do any work for their employer . . . until the object of the strike is attained, that is, until the employer grants the concession demanded :' " *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 560, 83 A. 2d 386, 390.

It is a contention on behalf of claimants that the initial fault for the work stoppage was upon the company because the union stopped work, as argued, "to prevent destruction of union working conditions." The argument is based on a contention that the company's proposal in the negotiations for changes in working conditions to be incorporated in the new contract amounted to such a drastic revision of the terms and conditions of employment as to create an open shop. Even if this were true, and the board did not so find, the proposal of the company to which the union objected related to a new contract which was the subject of negotiation; it did not in any way relate to the terms and conditions of employment which were in existence pending those negotiations and under which the employes could have continued working in the interim. The compensation authorities are not concerned with the respective offers and counter-offers of the parties to the negotiations as they relate to the proposed new contract; the concern of the compensation authorities relates only to the respective actions of the parties affecting the continued employment pending the negotiation of the new contract. *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 2), McCracken Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 403, 144 A. 2d 679.

Claimants also contend that in any event the initial work stoppage was converted into a lockout on December 1, 1955, when the company granted a wage increase to its non-union employes and refused the same increase to the claimants who proposed to return to work with such increase in pay pending further negotiation of the dispute. Claimants argue that, while normally employes should offer to return to work upon the terms and conditions of employment

in effect at the time the work stoppage began, if the employer improves the terms and conditions of employment for employes who are not involved in the strike the striking employes should be given an opportunity to return to work under the improved conditions pending settlement of the dispute. This argument ignores the fact that the dispute concerned, among other matters, the amount of the increase in wages which the striking employes should receive under the new contract. If the rule were as contended by claimants, employes would gain an obvious advantage at the bargaining table, and thus accomplish concessions which they sought from the employer and for which they initially went on strike. The Unemployment Compensation Fund is not to be used as an instrumentality to gain concessions in the course of collective bargaining. As to the employes who went on strike, the increase in wages granted to the non-union, non-striking employes was not a change or improvement in the terms and conditions of employment. The amount of the wage increase, if any, to be given to the striking employes was one of the main issues in the unsettled dispute between the parties; it was an essential part of the contract being negotiated. In the course of bargaining an employer may, as here, offer a wage increase as part of a package proposal, but it does not necessarily follow that the same or any wage increase would be offered in the absence of acceptance of the whole proposal. The argument that it would have been discriminatory to require the striking employes to return to work at a wage lower than that at which the non-union, non-striking employes were working ignores these circumstances. The non-union, non-striking employes accepted the wage increase as a final term of their contract; the striking employes desired it only while they continued negotiating for changes in the terms and conditions of employment to be written into

the new contract. The rule that, generally where a collective bargaining agreement is expiring or has expired and the parties are in the process of negotiating a new contract, the employer should maintain and the employes should accept existing terms and conditions of employment for a reasonable time pending those negotiations is designed to maintain employment during the temporary period that the parties are bargaining. Being temporary, it affords neither party an advantage pending negotiations, nor does it operate to the prejudice of either.

Apparently thereafter, on or about December 7, 1955, the union proposed that the employes return to work upon the pre-existing terms and conditions of employment if the company would agree to grant to the union employes at some future unstated time the same wage increases it had granted to the non-union employes with all other matters to be negotiated in the meantime. The company seems to have rejected this offer which, as well as the offer of December 1, 1955, sought a concession from the company on an essential matter involved in the dispute. The refusal of an employer to accept specified conditions under which the employes would return to work ordinarily does not constitute a lockout. *Burleson Unemployment Compensation Case,* 173 Pa. Superior Ct. 527, 533, 98 A. 2d 762; *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review (No. 2), McCracken Unemployment Compensation Case,* supra, 187 Pa. Superior Ct. 403, 144 A. 2d 679. The request of the employes that the company agree to grant them a wage increase at once or at some future time was not an unqualified offer to return to work pending settlement of the dispute, and did not convert the strike into a lockout.

Although the board found that the work stoppage was initially a strike, it concluded that by December

20, 1955, it was converted into a lockout and compensation was allowed for the weeks thereafter. A strike may be converted into a lockout. *Burger Unemployment Compensation Case*, 168 Pa. Superior Ct. 89, 91, 93, 77 A. 2d 737.

On December 19, 1955, Honorable George M. Leader, Governor of the Commonwealth, sent a telegram to Westinghouse Electric Corporation and to the International Union of Electrical, Radio and Machine Workers, CIO (IUE) (not the union involved in the present claims) in which the Governor proposed that that union and the company submit their dispute to final and binding arbitration with a resumption of work in the meantime. The board found that the Governor's telegram appeared in the daily public press, was heard over radio and television on the same day, and thus became a matter of public knowledge. It is not clear from the board's decision whether the union took any action to resume work in connection with the proposal of the Governor. The only finding of the board in this respect is finding of fact No. 15: "The union made known the willingness of its members to resume work but the company did not assent." There is no indication in this finding of the terms and conditions under which the employes would return to work; in fact the previous offers of the employes to return to work were conditioned upon an increase in wages. Moreover, the finding cannot possibly mean that the union actually accepted the proposal of the Governor, because the Governor did not address his telegram to this union.[3] It would seem rather incongruous to have accepted a proposal not made to it. If we assume that,

---

[3] In the telegram of Governor Leader to Westinghouse Electric Corporation and the International Union of Electrical, Radio and Machine Workers, CIO (IUE), the other union, it is specifically stated: "We have been advised that despite many weeks of discussion, representatives of the International Union of Electrical,

after the Governor's telegram to the other union, the
employes here involved offered to return to work un-
der terms identical with those appearing in the Gov-
ernor's proposal, that is, to resume work pending a
final and binding arbitration of the dispute, it would
be impermissible to conclude that the company's re-
fusal converted the strike into a lockout. The refusal
of an employer to accept specified conditions, for ex-
ample, an arbitration which it had no obligation to
accept, as the concession which it would have to make
in order to have the employes return to work does not
constitute a lockout. *Westinghouse Electric Corpora-
tion v. Unemployment Compensation Board of Review
(No. 2), McCracken Unemployment Compensation
Case*, supra, 187 Pa. Superior Ct. 403, 144 A. 2d 679.

The decision of the board denying compensation for
the weeks ending November 1, 1955, through Decem-
ber 19, 1955, is affirmed; the decision is reversed to
the extent that it allows compensation for the weeks
ending December 26, 1955, through February 20, 1956.

---

Radio and Machine Workers, AFL, CIO, and the Company have
been unable to find a basis for settlement of the dispute. . . . Un-
der these circumstances . . . we urge the Union and the Company
to submit their dispute to final and binding arbitration."