Alloway Unemployment Compensation Case.
American Dredging Company, Appellant, *v.*
Unemployment Compensation Board of
Review.

452

Argued December 15, 1965.   Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*Harvey B. Levin,* with him *Herman Lazarus, Harold Jacobs,* and *Lazarus and Levin,* for employer, appellant.

*Marshall J. Seidman,* with him *Seidman and Rome,* for employes, appellees.

*Sydney Reuben,* Assistant Attorney General, for Unemployment Compensation Board of Review, appellee.

OPINION BY WATKINS, J., September 15, 1966:
These appeals from the decision of the Unemployment Compensation Board of Review involve 99 employees of American Dredging Company, the appellant.

The employer is engaged in the business of river and harbor improvements in the Delaware River area. During the period of time here involved all of the claimants were members of Local 25, Marine Division, International Union of Operating Engineers and were working under one of two operating agreements, i.e., Drill Boat Agreement or the Dredging Agreement. Both of these agreements were in full force and effect at the time in question and contain clauses providing for final and binding arbitration of grievances and disputes and a prohibition against strikes, work stoppage or suspension of work.

Under the agreements, when work was available for members of the local, the employer requested the local, through its hiring hall, either by naming a specific member or the type of the employee needed and the union then referred the workman to the job. If the union failed to furnish an employee within 72 hours the employer could go to the general labor market to supply its needs.

On the night of October 31, 1963, members of the union met and voted to walk off their jobs. Their complaints consisted of claims of unsafe working conditions and abuse of the hiring procedure. The work stoppage continued until January 16, 1964, when an agreement was concluded. During the stoppage the company attempted to continue some of its jobs but was unsuccessful and finally forced to winterize and store the bulk of their operating equipment.

During the work stoppage the employer sent letters to the union, and twice to some, but not all of the registered members of the local, requesting their return to work and in one letter said that if they did not return by 4 o'clock p.m., December 2, 1963, the company would consider and treat them as though they had quit their jobs. Subsequent to this letter the employees were still importuned to return to their jobs. The

Board found as a fact that the claimants involved in these appeals were not discharged.

The Board in arriving at its decision found the work stoppage to be a labor dispute and divided the claimants into several categories, and determined each claimant's entitlement based on the facts and law applicable to the category in which he was placed. The categories involved in these appeals are as follows:

CATEGORY I: Claimants, such as John Alloway, who were employed and working at the time of the work stoppage and either walked off the job or failed to report for work. The Board disqualified this group for benefits from November 1, 1963 to February 2, 1964 because it found their unemployment to be due to a work stoppage existing because of a labor dispute under §402(d) of the Unemployment Compensation Act, 43 PS §802(d).

CATEGORY II: Claimants such as Frederick Cassidy, who were laid off because of lack of work some time prior to the work stoppage, never recalled during the dates involved, and who did not participate in the stoppage in any way. Their layoff was not in anticipation of the work stoppage. The Board held these claimants to be entitled to benefits for the entire period of their unemployment, and that their status had not changed as a result of the work stoppage; and claimants, such as John Harrington, who were similarly laid off but who later participated in the work stoppage by joining the picket line as a member of the union. The Board held these claimants to be disqualified for benefits from the time of their participation by picketing until February 2, 1964.

CATEGORY III: Claimants such as Anthony Dowidowicz, who were laid off prior to the work stoppage but who were recalled shortly before or at the time of the work stoppage and refused to return. The Board held these claimants to be disqualified for benefits from No-

vember 1, 1963 to February 2, 1964, because it found their unemployment was due to a work stoppage existing because of a labor dispute under §402(d) of the Act, supra.

Although a settlement was reached on January 16, 1964, the Board extended the date of disqualification to February 2, 1964, because of the time involved in getting the equipment in working condition after being laid up because of work stoppage.

The appellant employer contends that all the claimants should be disqualified for benefits from the time of the work stoppage until they requalified by reason of subsequent earnings in that they voluntarily left work without a compelling or necessitous reason under §402(b)(1) of the Act, 43 PS §802(b)(1). The employer further contends that claimants in categories I and II should be disqualified under §402(e) supra, because they were discharged for willful misconduct. We cannot agree with the appellant that what the employer did during the work stoppage constituted a discharge of the employees concerned in these appeals. The employer was treating them as voluntary quits. The Board found that they were not discharged and the finding is supported by the evidence. We are bound by it. *Progress Mfg. Co. v. Unemployment Compensation Board of Review*, 406 Pa. 163, 176 A. 2d 632 (1962).

The Board also found that the only men unequivocally discharged for willful misconduct were the 13 stewards who instituted the stoppage and whose cases are not appealed. See *Melchick Unemployment Compensation Case*, 396 Pa. 560, 154 A. 2d 875 (1959).

As to whether or not the claimants' conduct made them "voluntary quits" is controlled by the statute and prior decisions that even though a work stoppage is contrary to the terms of a union agreement, and may not be a "legal strike", it is nevertheless the result of a labor dispute. In the *Progress Mfg. Co.* case, supra,

the claimants engaged in an illegal strike but were held eligible for benefits because they were not discharged for willful misconduct as they could have been. This is also true in the instant case. If claimants in the *Progress Mfg. Co.* case engaged in an illegal strike and were voluntary quits, then the Court was duty bound to deny benefits for that reason. "An employe therefore may forfeit his right to unemployment compensation because of willful misconduct even though the misconduct which induced his discharge by the employer is related to a stoppage of work involved in a labor dispute." *Muldoon Unemployment Compensation Case,* 170 Pa. Superior Ct. 625, 631, 90 A. 2d 599 (1952).

The "voluntary quit" section of the Act, §402(b) (1), 43 PS §802(b)(1) has the following provision: "And provided further, That the provisions of this subsection shall not apply in the event of a stoppage of work which exists because of a labor dispute . . .".

A definition of the term "labor dispute" does not appear in the Unemployment Compensation Act. In the Pennsylvania Labor Anti-Injunction Act, 43 PS §206(c), it is defined as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment or concerning employment relations or any other controversy arising out of the respective interests of employer and employe, regardless of whether or not the disputants stand in the proximate relation of employer and employe, and regardless of whether or not the employes are on strike with the employer".

An almost identical definition appears in the Pennsylvania Labor Relations Act in 43 PS §211.3(h), which reads as follows: "The term 'labor dispute' includes any

controversy concerning—(1) terms, tenure or conditions of employment; or concerning (2) the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employe." These definitions clearly indicate the intention of the legislature in regard to the use of the term "work stoppage" as a result of a "labor dispute". In *Curcio Unemployment Compensation Case,* 165 Pa. Superior Ct. 385, 68 A. 2d 393 (1949), we held that under the Unemployment Compensation Law the term "labor dispute" is not defined, and the court may look to the realities to ascertain whether there was a labor dispute.

We agree with the Board that an essential ingredient of the term labor dispute is a disagreement over terms and conditions of employment between the employees and their employer and that, therefore, the fact that the work stoppage was illegal under the terms of a collective bargaining agreement, is not a factor in determining whether or not a labor dispute exists. This is true even though such action by the employee exposes him to being discharged for willful misconduct under the Act, supra.

The claimants such as John Harrington in Category II actively participated in the wildcat strike by picketing with the other members of the union. Under §402(d), supra, no person unemployed because of a labor dispute can recover unemployment compensation unless he can prove that he is not directly interested in the labor dispute and he is not a member of the striking union and he is not in the same grade or class of workers as the strikers. *Oluschak Unemployment Compensation Case,* 192 Pa. Superior Ct. 255, 159 A. 2d 750 (1960). The burden did not apply to claimants in Category II because they were not unemployed by

reason of a labor dispute. ". . . where unemployment is due to lack of work, the mere occurrence of a labor dispute will not change the legal causation of the unemployment . . .". *Jernstrom Unemployment Compensation Case,* 202 Pa. Superior Ct. 209, 214, 195 A. 2d 922 (1963).

The participation of these claimants in the labor dispute by joining in the walkout on the picket line subjected them to discharge for willful misconduct. Although they were not discharged the factual matrix of their unemployment changed and they were not available for recall and were then subject to the same burden of proof under §402(d) as the other walkouts. The Board properly so treated them in denying benefits from the date of such participation.

Decisions affirmed.

WRIGHT, J., concurs in the result.

ERVIN, P. J., dissents.

---

CONCURRING OPINION BY MONTGOMERY, J.:

The Pennsylvania Unemployment Act and the decisions under it make no distinctions in the use of the word "strike". I make particular reference to the definition of "suitable work" as contained in Section 4(t), 43 P.S. §753(t), which provides inter alia that, ". . . no work shall be deemed suitable in which (1) the position offered is vacant, due directly to a strike, lockout, or other labor dispute . . ."

Although appellant would have been justified in discharging some of these claimant-appellees for willful misconduct for participating in this strike contrary to the terms of their contract, I cannot see how they may be considered "voluntary quits".

In *Burleson Unemployment Compensation Case,* 173 Pa. Superior Ct. 527, 531, 98 A. 2d 762, 765 (1953), we said, "Whether or not the basic agreement remained in force, the work stoppage nevertheless resulted from

a labor dispute. If the basic agreement and the wages therein stipulated were binding upon the Local, its strike was a violation of the agreement. If the basic agreement was not validly extended or was terminated by the action of the Local, the work stoppage was nevertheless a strike. . . ." For our present purposes I see no difference between illegally terminating a contract and illegally suspending its operation, which happened in the present case. In the *Burleson* case the dispute was over wages and in the present case it is over unsafe working conditions and hiring procedures. However, in each case the result was a work stoppage recognizable as a strike. Whether this result is fair and reasonable is a matter which could induce much debate. However, that debate should be on the floor of the Legislature. It is not acceptable for consideration by this Court in the light of the law of this Commonwealth as I see it.

Therefore, I concur in the majority opinion.

OPINION BY HOFFMAN, J., CONCURRING IN PART AND DISSENTING IN PART:

I cannot agree that claimants such as John Harrington in Category II are ineligible for unemployment compensation benefits. The majority relies on §402 of the Unemployment Compensation Law which provides: "An employe shall be ineligible for compensation for any week . . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute . . . ." Harrington was laid off due to lack of work, prior to the walkout by the Dredging Company's employees. At no time was he notified of a date of recall. The labor dispute, which occurred more than a week after his layoff, did not change the legal cause of his unemployment. *Jernstrom Unemployment Compensation Case*, 202 Pa. Superior Ct. 209, 195 A. 2d 922 (1963). Since he was not idle "due to a stoppage

of work, which exist[ed] because of a labor dispute," he was not ineligible for benefits under §402(d) of the Act.

The mere fact that Harrington later participated in the picketing of the Dredging Company's plant cannot affect this result. A demonstration of sympathy with the union could not, of itself, alter the legal cause of his unemployment. Only a showing that work was available, but that claimant rejected such work because of the strike, would permit us to hold that the "factual matrix" of his unemployment had so changed as to disqualify him under §402(d). *Jernstrom Unemployment Compensation Case,* supra. The Board made no finding in Harrington's case, as it did in others, that continuing work was available for him after October 31, 1963. Furthermore, he was not specifically recalled by the company at any time during the labor dispute.

I would allow compensation benefits to claimants in Category II whose situation was similar to that of John Harrington.